**SAINT LUKE'S HOSPITAL, Petitioner,**

v.

**COLORADO CIVIL RIGHTS COMMISSION, Respondent.**

No. 84CA0624.

Colorado Court of Appeals, Div. II.

May 23, 1985.

Hughes & Dorsey, Anne Lewis, Richard L. Thorgren, Denver, for petitioner.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Christa Taylor, Asst. Atty. Gen., Denver, for respondent.

KELLY, Judge.

Petitioner, Saint Luke's Hospital, seeks review of an order of the Colorado Civil Rights Commission finding racial discrimination, arguing that the Commission applied incorrect law and that the order is not supported by substantial evidence. We affirm.

Although we do not have a transcript of the hearing on appeal, the accuracy of the hearing officer's findings are not challenged. Claimant, Ned Lottie, who is black, began work as a transporter at the Hospital in January of 1980. In September of 1982, another transporter, Sharolynn Young, reported to her supervisor that she had seen a nurse, Judy Inselman, give a bag of pills to a third transporter, Mark Sems. The supervisor investigated the incident after obtaining the assistance of Sharon Bridges, head of Hospital security.

The supervisor and Bridges interviewed Sems, who first denied any knowledge of stolen drugs, but subsequently recanted and produced a plastic bag full of assorted tablets and capsules including "Tylenol 3" tablets, a prescription drug containing the narcotic, codeine. Sems asserted that he had given Lottie three of the "Tylenol 3" tablets that morning and that he had given Lottie pills in the past.

When Lottie was interviewed, he admitted that, after complaining to Sems about a toothache that morning, he accepted two tablets offered to him by Sems believing them to be regular Tylenol. He denied any involvement with illegal drugs.

Sems also asserted that Young had approached him with an offer to trade marijuana cigarettes for pills. When Young was interviewed, she claimed that she was only an intermediary for Lottie who wanted to trade pills for marijuana. Young also stated that another employee, Cindy Buckles, had witnessed her conversation with Sems concerning the exchange of marijuana and pills.

When Buckles was interviewed, she admitted overhearing the conversation described by Young but stated that Lottie's name was not mentioned in the conversation. Both Lottie and Sems consistently denied that Lottie was involved in the proposed drug transaction between Sems and Young.

Bridges concluded from her investigation that Lottie knew that the pills Sems gave him were contraband. Lottie was terminated by the Hospital for accepting stolen narcotics, using a narcotic drug without a doctor's prescription, and failing to report this activity. Both Sems and Inselman, who are both white, were terminated for theft of drugs and illegal use of drugs. Young, who is black, was terminated for failing to report the request to trade pills for marijuana cigarettes. Buckles, who is white, was suspended for five days without pay for failing to report the conversation

concerning the proposed drug trade between Young and Sems.

At the hearing, the hearing officer also considered two other instances of employee discipline in the Hospital. A transporter, John Montoya, an Hispanic, received written warnings for unexcused absences and reporting to work while under the influence of illegal drugs and alcohol. Another employee, Dan Parkin, who was white, was disciplined, but not terminated, for failure to follow Hospital procedures, abusive behavior, inappropriate attire, and foul language. Lottie also introduced statistics which showed that from 1981 to 1983 although only 11.5% of the Hospital's employees were black, almost 35% of the employees terminated by the Hospital during that time period were black.

The hearing officer found that Lottie was a model employee who had consistently received work evaluations of above average or outstanding. The hearing officer also found that the hospital's evidence in support of terminating Lottie was "very weak" and that Lottie's explanation of the incident was "the most believable and consistent with the known facts." He further found that Lottie had no reason to suspect that the tablets given to him by Sems were illegally obtained or were prescription drugs, but that the Hospital chose to believe Sems, "an admitted liar and thief." The hearing officer also found that the Hospital's response to the situation "bordered on paranoia." Yet he concluded that Bridges' willingness to believe Lottie and Young to be drug users was overzealousness rather than discrimination. On review the Commission issued an order rejecting the ultimate conclusions of fact of the hearing officer, finding that a case of racial discrimination had been proved.

I.

The Hospital argues that the Commission erred in holding that discriminatory motive is not a necessary element of a disparate treatment action. We agree, but find no reversible error.

The hearing officer concluded that "in addition to proof of disparate treatment, complainant was also obliged to prove that there was a discriminatory motive behind Lottie's firing." The Commission ruled that the hearing officer erred as a matter of law in requiring such proof and held that "disparate treatment, by definition, is intentional and shows a discriminatory motive. . . ." We conclude that neither the hearing officer nor the Commission correctly stated the law.

■ Disparate treatment occurs when an employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Teamsters, supra.* A complainant is not required to submit direct evidence of discriminatory intent. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

■ The hearing officer incorrectly concluded that Lottie was required to prove a discriminatory motive in addition to discriminatory treatment, for sometimes, a discriminatory motive can be inferred solely from the discriminatory treatment. The Commission incorrectly concluded that disparate treatment, by definition, is always intentional. In some cases a complainant may be required to show more than mere difference in treatment to prove intent. Yet here, the Commission's incorrect articulation of the law does not warrant reversal because its decision turned upon its disagreement with the hearing officer's ultimate conclusions of fact, not law.

II.

The Hospital argues that the Commission's conclusions are not supported by substantial evidence. We disagree.

Judicial review of a ruling of the Civil Rights Commission is limited to the question whether, based upon the entire record, the Commission's findings are supported by substantial evidence. *Texas Southland Corp. v. Hogue,* 30 Colo.App. 560, 497 P.2d 1275 (1972). In determining whether the Commission's order should stand, the question is not whether this court would come to an identical conclusion upon the evidence. A court cannot substitute its own discretion for that reposed by statute in another tribunal. Due consideration must be accorded the presumption that an administrative body has acted fairly, with proper motives, upon valid reasons, and not arbitrarily. *Colorado Civil Rights Commission v. Colorado,* 30 Colo.App. 10, 488 P.2d 83 (1971).

Direct evidence of discrimination is not a prerequisite of a finding of discrimination since such a finding may be based on legitimate inferences from the evidence. *Texas Southland, supra.* Discrimination is often insidious, and it is very difficult to obtain direct evidence of its existence through single overt acts or statements of its perpetrators. Usually it can be proved only by drawing reasonable inferences from an act or statement or from a series of events or statements. *Coors v. Colorado Civil Rights Commission,* 31 Colo.App. 417, 502 P.2d 1113 (1972).

Here, there is substantial evidence in the record to support the Commission's finding of racial discrimination. Lottie presented evidence that he was treated differently than similarly situated employees, Buckles, Montoya, and Parkin. He also presented evidence that a disproportionate number of blacks had been terminated by the Hospital. From this evidence an inference can be drawn that the disparate treatment was the result of racial discrimination. The Commission did not agree with the hearing officer's ultimate conclusion of fact that there was no discrimination. The Commission, in exercising its review powers, is free to find ultimate facts independently of the findings of ultimate fact entered by the hearing officer.

*See R & R Well Service Co. v. Industrial Commission,* 658 P.2d 1389 (Colo.App. 1983).

Order affirmed.

SMITH and METZGER, JJ., concur.