Charles CUNNINGHAM, Complainant–
Appellee,

and

State Personnel Board, State
of Colorado, Appellee,

v.

DEPARTMENT OF HIGHWAYS,
Respondent–Appellant.

No. 89CA1241.

Colorado Court of Appeals,
Div. V.

March 14, 1991.

Rehearing Denied Aug. 1, 1991.

Certiorari Denied Jan. 27, 1992.

Safran and Adkins, Hubert M. Safran, Denver, for complainant-appellee.

No appearance for appellee State Personnel Bd.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Steven A. Chavez, Asst. Atty. Gen., Denver, for respondent-appellant.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Mary Ann Whiteside, First Asst. Atty. Gen., Denver, amicus curiae for Dept. of Personnel.

Opinion by Judge CRISWELL.

The Colorado Department of Highways (department) seeks review of an order entered by the State Personnel Board (board),

which determined that the department failed to promote one of its black employees, Charles Cunningham (complainant), because of his race and which directed the department to promote complainant and to undertake certain other affirmative action. In seeking this court's disapproval of that order, the department argues that (1) the board had no jurisdiction over the complainant's appeal because it was not filed in a timely fashion, (2) there is insufficient evidence to support the board's finding of racial discrimination, and (3) in any event, a portion of the remedy adopted by the board is unauthorized. We conclude that the board had jurisdiction over the controversy and that the record supports its findings of discrimination, but we also conclude that, in light of the violation that it found, its remedial order was too broad. Thus, we affirm the board's order in part and set it aside in part.

The complainant was first employed by the department in 1959 as a highway maintenance man and has been continuously employed with the department since that time. Claimant's original classification fell within the Equal Employment Opportunity (EEO) job category of technicians. Such an EEO job category is a broad grouping of jobs, all of which have similar skill levels.

In 1977, complainant successfully passed a promotional examination for the position of highway foreman and was placed number one on the eligibility list for that position. However, when a vacancy occurred in that job classification, the department reclassified the job from highway foreman to senior highway foreman in order to avoid appointing claimant to that position. As a consequence of charges filed by complainant at that time, the board found that the department had intentionally discriminated against him because of his race and ordered his appointment to the position of highway foreman with full back pay and benefits. When the department complied with this directive, complainant became the first black ever to hold a position with the department in the EEO job category of supervisors.

In January 1987, the department announced promotional examinations for three positions—highway maintenance superintendents I, II, and III. While the job functions of highway maintenance superintendents II and III are quite similar and while all three positions are within the EEO job category of administrators and officials, the board's administrative law judge (ALJ) found that the job responsibilities, and therefore the necessary qualifications, for highway maintenance superintendent I were substantially less than those for other two positions. The ALJ likened the superintendent I position to that of an apprentice. Nevertheless, the department gave only a single examination, containing the same questions, for all three positions. In addition, all applicants for all three positions were subjected to the same interview procedures.

Complainant was allowed to take this examination, but only as an applicant for the position of highway maintenance superintendent I, the least responsible of the three positions.

After he was informed that he had failed this examination, he appealed, first, to the director of the state personnel department and, later, to the board. In both cases, he asserted that, similar to its action in 1977, the department's administration of the examination was manipulated so as to deny him promotion because of his race.

The director concluded that he lacked jurisdiction to consider this issue, but he ruled upon other objections that complainant had raised. His decision upon these other objections was later approved by the district court, and those objections are not the subject of this appeal.

The board referred complainant's charge of racial discrimination to the ALJ, who conducted an evidentiary hearing and, thereafter, found that the conduct of the examination by the department resulted in racial discrimination against complainant. The ALJ's initial decision, therefore, directed the department to appoint complainant to the position of highway maintenance superintendent I with full back pay and benefits. The board approved the ALJ's deci-

sion, but amended his order to require the department also to cease all discriminatory "practices and activities" and to prepare a plan to remove the adverse impact upon all black persons of its present "selection and employment policies and procedures."

## I.

The department first argues that, because claimant failed to file a claim of discrimination with the board within ten days after being advised that he had failed the examination, the board lacked jurisdiction to rule upon his complaint. We disagree.

The pertinent state statutes give to state employees dual appeal rights.

■ First, if an employee feels aggrieved by any action taken in the "selection and examination process," that employee may file an appeal within ten days of that action with the director, who may either determine the issue himself or refer the matter to a three-member panel. The action complained of can be overturned only if it is determined to be "arbitrary, capricious, or contrary to rule or law." Section 24–50–112(3)(a), C.R.S. (1988 Repl.Vol. 10B). Any such decision is not reviewable by the board, but is subject to direct judicial review under § 24–4–106, C.R.S. (1988 Repl. Vol. 10A) of the Administrative Procedure Act.

On the other hand, § 24–50–125.3, C.R.S. (1988 Repl.Vol. 10B) governs all allegations by state employees of racial discrimination in employment, as described in § 24–34–402(1)(a), C.R.S. (1988 Repl.Vol. 10A). That statute provides that all charges of discrimination must be filed within ten days of the alleged practice with the board or with the Colorado civil rights division in the department of regulatory agencies.

Thus, all complaints about the selection and examination process *not* involving allegations of discrimination are to be filed with the *director*, while any claims of discrimination with respect to that process must be filed with the *board* or the civil rights division. *See* Personnel Board Rule 10–7–1, 4 Code Colo.Reg. 801–1 at 132–133.

■ The department argues, and we agree, that, if an appeal or a request for an extension of time is not filed within the statutory ten-day period, it is generally true that the agency lacks jurisdiction to review the action complained of. *See State Personnel Board v. Gigax,* 659 P.2d 693 (Colo.1983).

■ However, this is not true if the notice of the right to appeal, required to be given to the person who is adversely affected by that action, is not provided to that person. *Salas v. State Personnel Board,* 775 P.2d 57 (Colo.App.1988). Thus, if a state employee is not given notice of his right to pursue a claim of discrimination, and he has no actual knowledge of the procedure involved, then the statutory ten-day limitation period will start to run only after he receives notice thereof. *Quicker v. Colorado Civil Rights Commission,* 747 P.2d 682 (Colo.App.1987).

■ At the time of the events here, Personnel Board Policy 10–7–1(E), 4 Code Colo. Reg. 801–1 (May 1986 version at 114–115), required that:

"Employees and applicants shall be informed of their rights to seek review through grievance, petition for hearing, or appeal, including the time limits in which such rights and options must be exercised, and the official to whom correspondence should be directed."

However, the notice provided to complainant at the time he was advised that he had failed to pass the examination informed him only of his right to complain to the director; it failed to notify him that any claim of discrimination must be made to the board or to the civil rights division. As a result, when complainant was advised that he had failed the examination, he filed a timely appeal with the director and included a charge of racial discrimination.

The director, rather than simply forwarding complainant's charge of discrimination to the board, referred all of his complaints to a three-member panel in accordance with § 24–5–112(3)(a). However, when that panel rendered its decision, it noted that it

lacked authority to consider complainant's charge of discrimination.

While the panel's decision, issued in July 1987, is the only evidence of record to indicate that complainant was ever advised of his appeal rights with respect to his charge of discrimination, complainant filed such a charge with the board before that decision was announced. Under these circumstances, therefore, the department cannot be heard to assert that complainant's appeal to the board was untimely. *Salas v. State Personnel Board, supra; Quicker v. Colorado Civil Rights Commission, supra.* Hence, we conclude that the board had jurisdiction to adjudicate complainant's claim of racial discrimination.

## II.

■ The department also argues that the board's approval of the ALJ's finding of discrimination is not supported by the record evidence. However, our review of that evidence leads us to the contrary conclusion.

The ALJ found that, both under the "disparate treatment" theory of discrimination, *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and under the "disparate impact" theory, *see Griggs v. Duke Power Co,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the proof demonstrated that claimant had been discriminated against because of his race. However, because we conclude that the record supports the ALJ's finding that the department *intentionally* discriminated against claimant, we need not determine whether the state anti-discrimination statute, § 24–34–401 through § 24–34–406, C.R.S. (1988 Repl.Vol. 10A), encompasses the "disparate impact" theory of discrimination or, if so, whether the present record supports the ALJ's findings under that theory. *See Colorado Civil Rights Commission v. Travelers Insurance Co.,* 759 P.2d 1358 (Colo.1988) (interpretation placed upon federal statute is not necessarily proper interpretation of state statute).

This court has, on several occasions, noted that an intent to discriminate under the Colorado statute need not be proven by direct evidence, but may be inferred from the circumstances. *See, e.g., St. Luke's Hospital v. Colorado Civil Rights Commission,* 702 P.2d 758 (Colo.App.1985). Likewise, in *Colorado Civil Rights Commission v. Travelers Insurance Co., supra,* the supreme court concluded that, in order to establish a violation of the state statute, it is not necessary to prove the type of "invidious" discrimination normally required to establish an equal protection violation. It is sufficient to show that "the treatment of a person" is different because of that person's race.

In light of this standard, we conclude that the ALJ's finding of intentional discrimination, which was approved by the board, finds support in the circumstantial evidence adduced at the hearing. Among the circumstances that support the ALJ's inference of discrimination are the following:

a. In 1976 the board, in a special proceeding, concluded that blacks and other minorities had systematically been underutilized and discriminated against within the state personnel system.

b. In 1977, when complainant was number one on a promotional eligibility list, the department reclassified a vacant position of highway foreman to senior highway foreman to avoid appointing claimant to that position. The board found that such action constituted invidious racial discrimination and ordered complainant to be appointed to the next available position.

c. Part of the written examination administered to complainant and the other applicants was designed by career white male employees of the department who had been promoted from the lower ranks to positions as administrators and officials. Likewise, all three panel members who administered the examination and rated each applicant were also career white male administrators or officials within the department. Because of the small number of such positions in the department, it was permissible to infer, as the ALJ did, that these persons knew that complainant was the first black employee to fill a position in

the department's supervisor job category and that there were, at the time the examination was conducted, no black employees serving either as administrators or as officials within the department.

d. The examination attempted to test for three different job classifications at the same time, and there is evidence that such an examination was unique. Further, the qualifications needed for the job classification for which complainant was testing were different from, and less demanding than, the qualifications for the other two classifications. Yet, the same subjective questions were asked of the applicants for all three classifications. And, certain of these questions required greater knowledge than was required for the position complainant was seeking.

e. Aside from a general claim of efficiency, the department advanced no specific reason explaining why this examination was administered in this manner. In light of the department's prior manipulative attempt to prevent complainant's promotion, the ALJ found that the reason given for administering the test in this manner was a mere pretext.

f. To pass this examination, a score of 90 was necessary; complainant achieved a score of only 88. However, had not one of the raters lowered one of the raw scores he originally awarded to complainant, complainant's score would have been 92.

These circumstances, among others reflected in the record, are sufficient to support the inference that racial discrimination was the reason complainant did not receive a passing score and, therefore, was not placed on the appropriate eligibility list. Therefore, we need not decide whether the statistical evidence, which may or may not indicate an under-utilization of blacks and other minorities in certain of the department's job categories, could also be considered proper evidence of a discriminatory intent. *See Church v. American Standard Insurance Co.,* 764 P.2d 405 (Colo. App.1988).

■ Further, to the extent that the department argues that the findings and conclusions of the three-member panel appoint-

ed by the director under § 24-50-112(3), C.R.S. (1988 Repl.Vol. 10B), or the district court's judgment upholding that panel's decision, was binding on the ALJ or the board, such argument is rejected. The panel had no authority to pass upon complainant's claim of racial discrimination, and it did not purport to do so. Hence, its findings and conclusions, entered without an evidentiary hearing, that the examination was "conducted in accordance with accepted examination procedures," was made without consideration of the existence of an improper motive underlying the procedure followed in giving the test.

Because the ALJ and the board were faced with determining an issue wholly separate from that decided by the panel, the panel's prior decision was not binding upon them. *See Industrial Commission v. Moffat County School District RE No. 1,* 732 P.2d 616 (Colo.1987).

### III.

■ The department finally argues that, even if the board properly concluded that it had been guilty of intentional racial discrimination against complainant, the remedial order entered by the board was overly-broad and unauthorized. We agree in part.

The sole charge of racial discrimination levied against the department by complainant was based upon a single promotional examination. And, as noted above, the manner in which that examination was administered was unique; indeed, its very uniqueness was one of the factors that gave rise to a permissible inference of discrimination. Complainant made no claim, nor did he produce any evidence, respecting the discriminatory nature of the department's examinations in general.

There was evidence that there were no blacks filling positions in the administrators and officials category of jobs within the department. However, there were so few positions within this category that, even if qualified blacks did fill positions in that category in proportion to their representation in the relevant labor market,

there would still be less than one full-time black employee in such a position.

Accordingly, because of the small number of positions in the pertinent job category, as well as the small number of qualified blacks, either in the labor market generally or in the category of employees within the department from which similar promotions could come, the ALJ found, with record support, that "meaningful statistical comparisons" could not be done so as to indicate "the statistical significance or lack thereof, of the numerical under-utilization of blacks."

Finally, even if it were conceded that there were some numerical under-utilization of blacks in both job categories, the present record contains no explanation for such under-utilization. As noted, the type of examination to which complainant was subjected could not be a cause of such under-utilization, since it was not customary to administer an examination of this type.

Even under the "disparate impact" theory of discrimination, mere statistical disparity between the percentage of qualified minorities in the relevant labor force and the percentage of those minorities in the employer's work force, does not itself prove discrimination. At the very least, a particular employment practice or practices must be identified as the cause for the disparity. *See Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989); *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).

We conclude, therefore, that this record, while containing evidence sufficient to support a finding that complainant was discriminated against on an individual basis, would not support the finding that the department generally engaged in a pattern or practice of discrimination. Thus, a review of the board's remedial order must be undertaken in light of this conclusion.

■ The board's rule, Personnel Board Rule 11–1–5, 4 Code Colo.Reg. 801–1 at 154, authorizes the adoption of varying remedial orders upon a finding of discrimination:

"Upon a finding of discrimination after an adversary hearing, the board shall have the power to order (1) cease and desist orders; (2) affirmative action consisting of, but not limited to, hiring, reinstatement, or upgrading of employees, with or without back pay and compensation; (3) referring of applicants for employment by a State agency; (4) admission or continuation in enrollment in on-the-job training programs; (5) posting of notices and issuing orders as to the manner of compliance and corrective and/or disciplinary actions, as required; and (6) altering terms and conditions of employment, as appropriate."

Under similar grants of authority to quasi-judicial agencies, it has been held that remedial orders entered pursuant to such authority must bear a reasonable relationship to the statutory violation found to have occurred.

For example, the National Labor Relations Board, upon finding that either an employer or a labor organization has committed an "unfair labor practice," may enter a cease and desist order and may require the respondent "to take such affirmative action" as will effectuate the policies of the National Labor Relations Act. 29 U.S.C. § 160 (1988). However, this broad grant of authority does not authorize the National Labor Relations Board:

"to enjoin violation of all [the Act's] provisions merely because one violation is found; to justify restraint of other violations, it must appear that they bear some resemblance to that which the employer has committed, or that danger of their commission is to be anticipated from the course of his conduct in the past."

*N.L.R.B. v. Process & Pollution Control Co.,* 588 F.2d 786 (10th Cir.1978). *See also N.L.R.B. v. Express Publishing Co,* 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930 (1941).

■ In our view, the same implied restriction upon the exercise of the board's authority must be found to be present here. Thus, it is only to the extent that the board's remedial order may be justified by

the violations found to have occurred that it may be approved.

The board's remedial order required the following:

"The respondent, Department of Highways, is ordered to appoint the complainant, Charles Cunningham to the next opening in the job classification of Superintendent I within the Department of Highways with full back pay and benefits retroactive to the date when his appointment should have occurred. Additionally, respondent is hereby ordered to cease and desist any and all discriminatory employment practices and activities, which adversely affect the employment of black persons, and to correct the existing adverse impact on Black persons in the selection process in the EEO 4 categories of technician and skilled crafts persons as quickly as possible. The Department of Highways is ordered to prepare a plan for such elimination of the adverse impact on the Black persons in its selection and employment policies and procedures within 60 days of the date of this order, and that the Director of Personnel may review, modify as needed, and provide a written approved plan of action to the Department of Highways."

The department first argues that the board should not order complainant to be appointed to the next opening in the job classification for which he was examined because, even if he had passed that examination, he would have merely been put on an eligibility list. It argues that, in view of the fact that the appointing authority could appoint any one of the top three persons whose names appeared on the eligibility list, *see* Colo. Const. art. XII, § 13(5), placement of complainant's name on the eligibility list would not have assured his appointment in any case. We disagree with the department's conclusion.

We recognize that the department's argument in this respect is not totally without logic. *See Denver v. Gibson*, 37 Colo. App. 130, 546 P.2d 974 (1975). Nevertheless, the board has constitutional authority to adopt rules governing the appeal of state employees from actions of the ap-

pointing authority. Colo. Const. art. XII, § 14(3). And, given the board's determination that the department was guilty of *intentional* discrimination on two previous occasions, allowing the department to apply the "rule of three" to complainant in this case would provide no effective remedy for the previous discriminatory action found to have occurred. It would merely have allowed that practice to continue.

Thus, we conclude that the board's rule gave it the authority to order that complainant be appointed to the next available position. Unlike the charter and ordinance provisions involved in *Denver v. Gibson, supra,* the specific authority granted to the board by the constitution and its rule enacted pursuant thereto justifies this portion of the board's order.

However, we agree that the remainder of the board's order, requiring the elimination of "all discriminatory practices and activities" and the "elimination of the adverse impact on black persons" in the department's selection and appointment policies, and procedures, is unwarranted and unauthorized by the record in this case. As we have previously noted, that record does not identify any "practices and activities" or "policies and procedures" that have resulted in discrimination against blacks in general. While the facts surrounding this particular case may well give rise to a suspicion that such practices, activities, policies, or procedures do exist, this record is insufficient to demonstrate their existence.

Further, without an identification of the nature of the practices, activities, policies, or procedures that are unlawful, a blanket order to cease such practice and activities, or to eliminate the adverse impact of such policies and procedures, gives no guidance to the department in determining the nature of the actions required by the board's order.

We are convinced, therefore, that, given the specific factual circumstances presented by this record, the board had no authority to direct the department to engage in any corrective action other than those actions designed to provide a remedy for the particular discriminatory act that was

found to have occurred. *See Easley v. Anheuser–Busch, Inc.*, 758 F.2d 251 (8th Cir.1985) (in case in which only hiring of bottlers was in issue, trial court judgment prohibiting all forms of racial discrimination against every employee or applicant for every job was overly broad and vague).

The first sentence of the Board's order is affirmed. The remainder of its order is set aside.

PLANK, J., concurs.

COYTE *, J., dissents.

Judge COYTE dissenting:

I respectfully dissent.

The events here at issue began when the Department of Highways announced promotional examinations for three positions within the Department: Highway Maintenance I, II, and III. The qualifications for the Highway Maintenance I position were substantially lower than those for the other two positions. The hearing officer found, on supporting evidence, that the Superintendent I classification is intended as something of an apprentice level for the Superintendent II and Superintendent III classifications, which are journeyman level.

In other words, the design of the three levels contemplates that a certain amount of on-the-job training for the higher classifications will occur at the Superintendent I classification.

The prerequisite for applying for the Superintendent I position is two years' experience as a Senior Highway Maintenance Supervisor. To apply for Superintendent II or III, the applicant must have four years' experience as a senior Highway Maintenance Supervisor, or two years as Superintendent I.

Cunningham was not qualified to take the test for Superintendent II or III. Consequently, he should not have been allowed to take the test and should not have been graded on the questions pertaining to those positions. However, he was permitted to participate fully in the examination.

It is conceded that questions were asked, especially in the oral exams, which were not job-related to, nor in the specifications for, the position of Superintendent I. One major element of the job classification specifications of Superintendent II and III is that these classifications require a high level of responsibility in budget matters and considerable knowledge of the budget system. And, from the record, it appears that Cunningham failed to pass the test because of his failure to address adequately one of the two "budget" questions on the test.

Under this set of circumstances, it is apparent that each applicant taking this test for Superintendent I position was equally disadvantaged. Each position required different skills and responsibilities, yet all applicants were given the same examination and promotions were made from the results of this examination. The test given to Cunningham was essentially upgraded from Superintendent I to Superintendent II and III.

In my view, the evidence does not support the charge that Cunningham was discriminated against because of his race.

The fact that in 1977 the Department was found to have discriminated against him is not probative concerning his present charge of racial discrimination. Likewise, as found by the hearing officer, the evidence does not support the charge of racial discrimination by either the disparate treatment or the disparate impact theory. Nor do I consider the incidents cited by the majority as being supportive of the hearing officer's finding of racial discrimination.

Indeed, in my view, by concluding that discrimination may be inferred from the fact that white males drafted and administered the test the majority itself is impugning the character of a group on an invidious basis.

* Sitting by assignment of the Chief Justice under provisions of the *Colo. Const.* art. VI, § 5(3), and

§ 24–51–1105, C.R.S. (1988 Repl.Vol. 10B).

Thus, I find nothing in the record to support the charge of any racial discrimination against Cunningham.

All applicants taking the test for position Superintendent I were placed at a similar disadvantage by being given a test requiring knowledge beyond the skill and ability to perform the duties of that position. Thus, such applicants should be accorded a re-examination under a test designed for the Superintendent I position, but I find no basis for an order directed at rectifying any racial discrimination against Cunningham or others. Hence, I would reverse the order in its entirety.