2012 COA 95

**MESA COUNTY LAND CONSERVANCY, INC., Plaintiff–Appellee,**

v.

**Sam A. ALLEN and Susie R. Allen, Defendants–Appellants.**

**No. 11CA1416.**

Colorado Court of Appeals, Div. VII.

June 7, 2012.

Trout, Raley, Montaño, Witwer & Freeman, P.C., Peter D. Nichols, Denver, Colorado; Allan C. Beezley, P.C., Allan C. Beezley, Boulder, Colorado, for Plaintiff–Appellee.

Dufford, Waldeck, Milburn & Krohn, LLP, Nathan A. Keever, Matthew A. Montgomery, Grand Junction, Colorado, for Defendants–Appellants.

Ducker, Montgomery, Lewis & Bess, P.C., Melinda M. Beck, Christopher S. Mills, Ste-

ven K. Imig, Denver, Colorado, for Amicus Curiae Colorado Coalition of Land Trusts.

Zachary Smith, Amy W. Beatie, Denver, Colorado, for Amicus Curiae Colorado Water Trust, Inc.

Opinion by Judge FOX.

■ ¶ 1 In this dispute over a conservation easement encumbering mutual ditch shares, Sam A. and Susie R. Allen (the Allens), defendants, appeal the trial court's judgment (1) granting summary judgment in favor of plaintiff, Mesa County Land Conservancy, Inc. (Mesa Land Trust); (2) denying the Allens' motions for summary judgment;[1] and (3) granting injunctive relief in favor of Mesa Land Trust.[2] We affirm.

## I. Background

¶ 2 In 1990, the United States, acting by and through the Farmers Home Administration, granted a deed of conservation easement (the 1990 Easement) to Mesa Land Trust. The conservation easement covered 140 acres of land in Mesa County, Colorado (the property), and provided that "[a]ll water rights held at the date of this conveyance shall remain with this land." The 1990 Easement was recorded in the Mesa County real estate records. When the United States conveyed the 1990 Easement to Mesa Land Trust, the United States held nine shares of capital stock in a mutual ditch company, the Big Creek Reservoir Company (the Big Creek shares), which was a vehicle for the ownership of water rights.

¶ 3 The Allens purchased the property in 1993, subject to the 1990 Easement. The deed transferring the property to the Allens specifically referred to the Big Creek Shares. In 2007, the Allens sold the property, but purported to exempt the Big Creek shares from the conveyance. Mesa Land Trust sought declaratory and injunctive relief against the Allens for violating the terms of the 1990 Easement by attempting to sever the Big Creek shares from the land.

¶ 4 The Allens filed two motions for summary judgment on grounds that the Big Creek shares were not encumbered by the 1990 Easement because the Easement did not comply with section 38–30.5–104(5), C.R.S.2011, or with article 8 of Colorado's Uniform Commercial Code. Mesa Land Trust filed a motion for summary judgment seeking a declaratory judgment that the Allens may not exempt the Big Creek shares from the conveyance. The trial court denied the Allens' motions, and issued a permanent injunction in favor of Mesa Land Trust, requiring the Allens to convey the Big Creek shares to the purchasers and prohibiting the Allens from severing the Big Creek shares from the property. The Allens appeal the judgment.

## II. Standard of Review

¶ 5 Because the parties do not dispute the facts, and each issue presented is one of law, our review is de novo. *Bly v. Story,* 241 P.3d 529, 533 (Colo.2010) (statutory interpretation is a question of law that we review de novo); *Palizzi v. City of Brighton,* 228 P.3d 957, 962 (Colo.2010) (we review legal conclusions de novo); *City of Golden v. Parker,* 138 P.3d 285, 289 (Colo.2006) (the application of a constitutional standard is a question of law subject to de novo review).

## III. 2003 Amendments to the Conservation Easement Statute

¶ 6 In 2003, the General Assembly amended certain parts of the conservation easement statutes, sections 38–30.5–101 to –111, C.R.S. 2011 (the 2003 amendment). The Allens contend that the 1990 Easement is invalid because (1) the definition of "conservation easement" in the relevant statute in effect in 1990 did not authorize encumbrance of water rights; and (2) the Easement does not comply with the notice requirement in the 2003

---

1. An order denying a motion for summary judgment is a final, appealable order when the trial court grants a cross-motion that disposes of the claims and ends the action. *Snell v. Progressive Preferred Ins. Co.,* 260 P.3d 37, 39 (Colo.App. 2010); *Mahaney v. City of Englewood,* 226 P.3d 1214, 1217 (Colo.App.2009).

2. The Colorado Coalition of Land Trusts and Colorado Water Trust, Inc. jointly filed a brief as amici curiae in support of Mesa Land Trust.

amendment of section 38–30.5–104(5). Mesa Land Trust contends that the 1990 Easement is valid because the definition of conservation easement in the statute in effect (the 1976 statute) when the 1990 Easement was created allowed water rights to be encumbered, and, if the 2003 amendment to the notice requirement applies retroactively, the amendment is unconstitutionally retrospective. We conclude that the notice requirement does not apply retroactively.

¶ 7 As pertinent here, article II, section 11 of the Colorado Constitution provides that the General Assembly shall not pass a law that is retrospective in operation.[3] Although retroactive application of a statute is disfavored, such application is not necessarily unconstitutional; only retrospective legislation is constitutionally prohibited. *Powell II,* 156 P.3d at 465. We first consider whether the legislature intended the legislation to apply retroactively. *City of Greenwood Village v. Petitioners for Proposed City of Centennial,* 3 P.3d 427, 444 (Colo.2000). If the law was intended to apply retroactively, the question of constitutionality rests on whether the legislation impairs a vested right or creates a new obligation. *Id.; see also Van Sickle v. Boyes,* 797 P.2d 1267, 1271–72 (Colo.1990). If the retroactive application of the legislation violates the constitutional prohibition on ex post facto laws, it is deemed retrospective and, as such, is invalid. *Greenwood Village,* 3 P.3d at 444; *Van Sickle,* 797 P.2d at 1271–72.

#### A. Retroactive Intent

¶ 8 Absent legislative intent to the contrary, a statute is presumed to operate prospectively, meaning it operates on transactions occurring after its effective date. *In re Estate of DeWitt,* 54 P.3d 849, 854 (Colo. 2002).

¶ 9 In addition to the presumption that legislation applies prospectively, there is also a presumption that, when the legislature amends a statute, it intends to change the

existing law. *Academy of Charter Schs. v. Adams Cnty. Sch. Dist. No. 12,* 32 P.3d 456, 466 (Colo.2001). This presumption can be rebutted, however, by showing that the legislature intended only to clarify an existing ambiguity in the statute. *Id.* Accordingly, if an amendment clarifies an ambiguity, the law remains unchanged by the amendment, and "it may provide convincing evidence of the legislature's intent to apply the amendment retroactively." *Powell v. City of Colo. Springs,* 131 P.3d 1129, 1132 (Colo.App.2005) (*Powell I*), *affirmed,* 156 P.3d 461 (Colo. 2007) (*Powell II*).

¶ 10 We employ a three-part analysis to distinguish between a change and a clarification by (1) assessing whether the statute was ambiguous before it was amended, (2) reviewing the legislative history surrounding an ambiguous amendment, and (3) considering the statute's plain language. *Powell II,* 156 P.3d at 465; *Academy of Charter Schs.,* 32 P.3d at 464.

#### 1. Ambiguity Before the Amendment

¶ 11 The 1976 version of section 38–30.5–102 defined a conservation easement in gross as "a right in the owner of the easement to prohibit or require, a limitation upon, or an obligation to perform, acts on or with respect to a land or *water area* or air space above the land or water owned by the grantor." Ch. 153, sec. 1, § 38–30.5–102, 1976 Colo. Sess. Laws 750 (emphasis added). In 2003, House Bill 03–1008 (the bill) was passed. The bill amended the definition to include "water rights beneficially used upon that land or water area," as follows:

> "Conservation easement in gross," for the purposes of this article, means a right in the owner of the easement to prohibit or require a limitation upon or an obligation to perform acts on or with respect to a land or water area, airspace above the land or water, or water rights beneficially used

---

3. A statute is retroactive if it applies to transactions that have already occurred or to rights or obligations that existed before that statute's effective date. *City of Colorado Springs v. Powell,* 156 P.3d 461, 464 (Colo.2007) *(Powell II); American Comp. Ins. Co. v. McBride,* 107 P.3d 973, 977 (Colo.App.2004). A statute is retrospective if it creates a new obligation in respect of a past transaction. *Powell II,* 156 P.3d at 465.

upon that land or water area, owned by the grantor. . . .

§ 38–30.5–102, C.R.S.2011.

¶ 12 The bill also modified section 38–30.5–104(1), which originally authorized creation of a conservation easement in gross "by the record owners of the surface of the land," Ch. 153, sec. 1, § 38–30.5–104(1), 1976 Colo. Sess. Laws 751, to include, "if applicable, owners of the water or water rights beneficially used thereon," as follows:

> A conservation easement in gross may only be created by the record owners of the surface of the land and, if applicable, owners of the water or water rights beneficially used thereon by a deed or other instrument of conveyance specifically stating the intention of the grantor to create such an easement under this article.

§ 38–30.5–104(1), C.R.S.2011.

¶ 13 The 1976 statute used the term "water right" in section 38–30.5–110, which provided that the statute would not impair, invalidate, or adversely affect "any transfer of a water right or any change of a point of diversion at any time." Ch. 153, sec. 1, § 38–30.5–110, 1976 Colo. Sess. Laws 752.[4] The 1976 statute's use of the term "water right" in section 38–30.5–110 could indicate an intention to reference the beneficial use of water. This could suggest that, by using the term "water area" rather than "water right" in section 38–30.5–102, the legislature intended to exclude water rights from the sections that authorized and defined conservation easements. However, including the phrase "water right" in section 38–30.5–110 suggests that former 38–30.5–102 authorized conservation easements that *included* water rights, even though it used the terminology "water area." Because different interpretations are possible, we conclude that the 1976 statute

was ambiguous as to whether "water rights" were included in section 38–30.5–102.[5]

¶ 14 When the 2003 amendment was introduced to the House Committee on Agriculture, Representative Lola Spradley, one of the amendment's main sponsors, noted the ambiguity, and the need to resolve it:

> [W]e have a responsibility to . . . remove ambiguity when people are making big decisions. . . . [O]ne of [the] things that we've identified [i]s . . . a possible ambiguity [unintelligible] the water rights and whether or not they are included, excluded and what the . . . issues are with water rights . . . if there's a willing buyer, willing seller on . . . these conservation easements. Hearings on H.B. 03–1008 before the H. Agric., Livestock & Natural Res. Comm., 64th General Assemb., 1st Sess. (Jan. 29, 2003) (House Committee Hearing).

¶ 15 Thus, the plain language of the previous statute, combined with contemporaneous constructions of the statute's language, convinces us that before the amendment, the statute was ambiguous with respect to water rights. We therefore proceed to consider the legislative history of the statute. *See Powell II*, 156 P.3d at 465 (when determining whether the legislature intended to clarify or change existing law, we consider (1) whether the statute was ambiguous before the it was amended; (2) the legislative history surrounding the amendment, and (3) the plain language of the statute).

### 2. Legislative History

■ ¶ 16 The legislative history reveals an unequivocal intent to clarify, and not to change, the statute. Although not conclusive proof of legislative intent, statements made during committee hearings reveal the understanding of legislators and thus, help identify their intent. *People v. Rockwell*, 125

---

**4.** As amended, section 38–30.5–110, C.R.S.2011, now refers to "any transfer of a water right or any change of a point of diversion at any time decreed prior to the recordation of any conservation easement in gross restricting a transfer or change."

**5.** A law review article published in 2002 discussed the uncertainty concerning conservation easements affecting water rights in Colorado. Peter D. Nichols, *Do Conservation Easements and*

*Water Law Mix (in Colorado)?*, 5 U. Denv. Water L.Rev. 403, 516–21 (2002). The article explained that, although most Colorado attorneys practicing in the area of conservation easements believed that Colorado's statute covered water rights, the statute's ambiguity made it susceptible of conflicting interpretations. The article invited the legislature to resolve the ambiguity. *Id.* at 524.

P.3d 410, 419 (Colo.2005). Testimony of a bill's sponsor concerning its purpose and anticipated effect can be powerful evidence of legislative intent. *Vensor v. People*, 151 P.3d 1274, 1279 (Colo.2007). At three different hearings, the bill's primary sponsors, Representative Spradley and Senator Ken Kestor, discussed the intent to clarify the easement statute:

- On January 29, 2003 at a hearing before the House

  Agriculture Committee, Representative Spradley testified:

  [W]e've had willing buyers and willing sellers enter into conservation easements where ... the value of [the easement] may have to do with some of the water facilities on that property ... the water to protect the hay field, the water for wetlands.... [There has] been discussion and been a commitment from the land owner that those things will stay there. But, it [has] not been explicitly expressed in here and in order to avoid litigation, in the future about that *clarification*, because everybody had a legal opinion. It says, yes you can do what you've been doing, but in order to avoid litigation in the future, *we're simply here to clarify* that ... and *to clarify* those terms and conditions....

  House Committee Hearing (emphasis added).

- On February 3, 2003, during the second reading before the House, Representative Spradley testified:

  [The bill] basically takes care of some concerns about the language ... and uses language that those in the water industry are more comfortable with ... and *it clarifies the issue* when you have a ditch company involved.

  Second Reading of H.B. 03–1008 before the House, 64th Gen. Assemb., 1st Sess. (Feb. 3, 2003) (emphasis added) (House Second Reading).

- On February 27, 2003 before the Senate Agricultural

  Committee, Senator Kestor testified:

  *The purpose of this bill is to clarify* the [unintelligible] rights and legislation for

conservation easements where the land is voluntarily protected by those easements and this would ... tie the water rights to the land to help protect its conservation value.

Hearing on H.B. 03–1008 before the S. Agric., Natural Res. & Energy Comm., 64th Gen. Assemb., 1st Sess. (Feb. 27, 2003) (emphasis added) (Senate Committee Hearing).

¶ 17 Indications of what the legislature did not intend can be as important as indications of what the legislature intended. *Vensor*, 151 P.3d at 1279. The sponsors testified that the bill was not intended to change the existing law. Representative Spradley stated, "[The bill] does not change existing water law. It doesn't change, and it doesn't undermine existing water law." House Committee Hearing.

¶ 18 As discussed below, because there is no other legislative history contradicting the bill sponsors' repeated and express intentions to clarify, and not to change, the statute, we conclude that the legislative history indicates that the 2003 amendment was intended to clarify an ambiguity in the law. *See Academy of Charter Schs.*, 32 P.3d at 466.

### 3. The Statutory Language

¶ 19 The applicability section of the separate amendment to section 38–30.5–104(2) states, "The provisions of this act shall apply to conservation easements created *prior to*, on, or after the applicable effective date of this act." Ch. 142, sec. 2(2), 2003 Colo. Sess. Laws 1022 (emphasis added). Section 38–30.5–111(2), C.R.S.2011, states, "Any conservation easement in gross affecting water rights created *prior to the effective date* of this subsection (2) shall be a binding, legal, and enforceable obligation if it complies with the requirements of this article" (emphasis added). Although the statute does not contain the word "retroactive," the statute applies expressly to conservation easements created before the 2003 amendment.

¶ 20 Our analysis indicates that (1) the statutory language was ambiguous before the 2003 amendment; (2) the legislature intended to clarify, and not to change, the statute; and (3) the statute includes a provision that

the 2003 amendment applies to previously created conservation easements. We therefore conclude that the legislature intended the statute to apply retroactively. *See, e.g., Academy of Charter Schs.,* 32 P.3d at 466 (legislature's intent to clarify the statute, and its response to the district court's decision, provide convincing evidence of the legislature's intent to apply the changes retroactively).

### B. Retrospective Application

¶ 21 Having determined that the legislature intended the 2003 amendment to be retroactive, we next consider whether the statute is unconstitutionally retrospective. *Greenwood Village,* 3 P.3d at 444. A statute is retrospective if it impairs a vested right or creates a new duty, obligation, or disability with respect to a past transaction. *Id.*

¶ 22 Mesa Land Trust contends that, if the 2003 amendment is retroactive, it is unconstitutionally retrospective solely as to the notice requirement because it impairs Mesa Land Trust's vested rights in the Big Creek shares. The Allens respond that the 2003 amendment is not retrospective because Mesa Land Trust does not have any vested rights in the Big Creek shares. According to the Allens' argument, because the 1976 statute did not recognize conservation easements encumbering water rights as valid interests in land, the 1990 Easement was void as to any interest in a water right.

¶ 23 We reject the Allens' argument because the 1976 statute authorized the creation of conservation easements encumbering water rights, and Mesa County's 1990 Easement gave it a vested interest in the water rights.

### 1. Pre–2003 Amendment Water Rights Easements

¶ 24 As discussed in section III.B. above, the legislature intended the 2003 amendment to clarify that the conservation easements applied to water rights. Because we concluded that the 2003 amendment did not change the law, and it is undisputed that the 2003 amendment includes water rights, it follows that the 1976 statute included water rights. Indeed, during the second reading of the bill before the House, Representative Spradley explained that the 2003 amendment was intended to validate the practice of encumbering water rights under the 1976 statute:

> What this bill does is clarify that something that most of us agree happens. . . . And that is it simply says that water . . . specifically can be used in a conservation easement. . . . [I]t simply clarifies that so at some future time, those people who've made that permanent commitment don't wind up in some kind of litigation over something that *we all believe is included.*

House Second Reading (emphasis added). If the bill had been intended to authorize the encumbrance of water rights for the first time, Representative Spradley would have said that the bill was intended to prevent litigation over something that they all believed *should have been* included; instead, Representative Spradley stated that the bill was intended to prevent litigation over something that *"is* included" (emphasis added). We therefore conclude that the 1976 statute always applied to water rights.

### 2. Section 38–30.5–111(2)

¶ 25 Section 38–30.5–111(2) contains a "grandfather clause." It states, "Any conservation easement in gross affecting water rights created prior to August 6, 2003, shall be a binding, legal, and enforceable obligation *if it complies with the requirements of this article."* (Emphasis added.) The article, as amended in 2003, added a notice requirement. The Allens contend that because the notice requirement was not met, the water rights at issue here were not "grandfathered in," and they were thus free to convey those water rights separately from the land irrespective of the conservation easement. We next consider the notice requirement.

### 3. Notice Requirement

¶ 26 In addition to clarifying that the statute applies to water rights, the legislature added the following notice requirement in the 2003 statute:

> If a water right is represented by shares in a mutual ditch or reservoir company, a

conservation easement in gross that encumbers the water right may be created or revoked only after sixty days' notice and in accordance with the applicable requirements of the mutual ditch or reservoir company, including, but not limited to, its articles of incorporation and bylaws. . . .

§ 38–30.5–104(5), C.R.S.2011. We agree with the trial court that application of the 2003 notice requirement to easements that predated the enactment of that requirement would be unconstitutional.

¶ 27 First, imposing the notice requirement on pre-existing conservation easements would directly undermine the legislature's intentions, because it would render pre-existing conservation easements invalid unless, by chance, a grantor complied with a sixty-day notice provision that did not exist when the 1990 Easement was created. Additionally, such an interpretation would lead to litigation over pre-existing easements to determine whether the 2003 notice requirements were satisfied when the encumbrance was created, which would clearly be contrary to legislative intent. *See* House Second Reading (explaining that the bill is intended to prevent litigation); *see also Hernandez v. People*, 176 P.3d 746, 751 (Colo.2008) (appellate court avoids an interpretation of a statute that leads to "illogical or absurd results").

¶ 28 As the record here shows, the Allens are attempting to gain a windfall profit by severing the water rights from the land and selling those valuable rights separately. In essence, they have tried to convey more rights than they acquired from the United States in 1993. The land they purchased in 1993 was already burdened with the 1990 Easement, which included the Big Creek Shares. Interpreting the 2003 amendment to invalidate the application of the easement to water rights based on a later-created notice requirement would not serve any legitimate purpose. The notice requirement most likely was intended to benefit the ditch company, not the Allens. We must avoid any statutory construction that would produce an illogical and absurd result. *See Hernandez*, 176 P.3d at 751.

¶ 29 Moreover, "our analysis is bounded by the principle that we must presume a statute to be constitutional." *Buckley v. Chilcutt*, 968 P.2d 112, 116 (Colo.1998). If two interpretations of a statute are possible, we must avoid the interpretation that renders it unconstitutional. *Id.* Interpreting the statute as imposing the sixty-day notice requirement on pre-existing conservation easements would render the statute unconstitutionally retrospective because it would invalidate water rights encumbrances that omitted a notice requirement that did not exist before 2003. *See Greenwood Village*, 3 P.3d at 444 (a statute is unconstitutionally retrospective if it impairs a vested right or creates a new duty, obligation, or disability with respect to a past transaction).

¶ 30 Here, as discussed above, the addition of the phrase "water rights" was meant to clarify the statute, and did not impose a new duty, obligation, or responsibility upon parties. However, the sixty-day notice requirement included in section 38–30.5–104(5) is not a clarification, but rather a new obligation, affecting substantive rights.

¶ 31 To prevent unconstitutional retrospectivity, we therefore construe the notice requirement of section 38–30.5–104(5) as applying prospectively only to conservation easements created on and after the date of the 2003 amendment, and conclude it does not apply to pre-existing encumbrances. This interpretation is consistent with our analysis of the legislative history, which indicates that the legislature intended to protect pre-existing conservation easements, not to invalidate them. *See People v. District Court*, 713 P.2d 918, 921 (Colo.1986) (we avoid statutory interpretations that defeat the obvious legislative intent, and when possible, we interpret a statute to give consistent, harmonious, and sensible effect to all of its parts); *Glover v. Innis*, 252 P.3d 1204, 1206–07 (Colo.App.2011) (same).

### 4. Big Creek Shares' Validity

¶ 32 Given our construction of the 2003 amendment, we next turn to whether the contested water rights, the Big Creek shares, are valid. The parties dispute only whether the 1990 Easement complies with

section 38–30.5–104, which addresses the creation of conservation easements. Thus, we need only determine whether the encumbrance of the Big Creek shares complied with the requirements for creating a conservation easement under then-applicable law, the 1976 statute.

¶ 33 The 1976 statute provided that "[a] conservation easement in gross may only be created by the record owners of the surface of the land by a deed or other instrument of conveyance specifically stating the intention of the grantor to create such an easement." Ch. 153, sec. 1, § 38–30.5–104(1), 1976 Colo. Sess. Laws 751. The United States was the record owner of the property and the Big Creek shares when it created the conservation easement by deed in 1990. The recorded 1990 Easement states the grantor's intent that "[a]ll water rights held at the date of this conveyance shall remain with this land." As mutual ditch shares, the Big Creek shares are water rights. *See Jacobucci v. District Court*, 189 Colo. 380, 387, 541 P.2d 667, 672 (1975). Thus, the 1990 Easement specifically stated the grantor's intent to encumber the Big Creek shares in accordance with then-existing statutory requirements. *See also Denver Joint Stock Land Bank v. Markham*, 106 Colo. 509, 513, 107 P.2d 313, 315 (1940) (looking to the intention of the grantor to determine whether water rights pass with the land); *see also Valley Dev. Co. v. Weeks*, 147 Colo. 591, 364 P.2d 730 (1961) (the owner of the servient estate cannot interfere with the rights of the dominant estate owner). Accordingly, the 1990 Easement was valid when it was created.

### IV. UCC Applicability

¶ 34 The Allens contend that the Big Creek shares are securities subject to a prior version of Colorado's Uniform Commercial Code (the UCC), section 4–8–102. According to the Allens', even if the conservation easement is valid under the 2003 amendment, it is not effective against them because it did not comply with the UCC's notice requirements in former section 4–8–204. We reject the Allens' argument because the UCC does not apply to mutual ditch shares.

¶ 35 Section 4–8–102(1)(b), as it existed when the 1990 Easement was created, provided the following definition of securities:

A "certificated security" is a share, participation, or other interest in property or an enterprise of the issuer or an obligation of the issuer which is:

(I) Represented by an instrument issued in bearer or registered form;

(II) Of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

(III) Either one of a class or series or by its terms divisible into a class or series of shares, participations, interests, or obligations.

Ch. 68, sec. 1, § 4–8–102(1)(b), 1981 Colo. Sess. Laws 352–53.

¶ 36 It is well-settled in Colorado that mutual ditch company shares are "unlike ownership of stock in other corporate entities." *Great Western Sugar Co. v. Jackson Lake Reservoir & Irrigation Co.*, 681 P.2d 484, 491 (Colo.1984); *see also Southeastern Colo. Water Conservancy Dist. v. Fort Lyon Canal Co.*, 720 P.2d 133, 141 (Colo.1986) ("it is clear that stock ownership in a mutual ditch company constitutes ownership of a real property interest in water rights rather than a personal property interest in corporate stock") (*Fort Lyon Canal*); *Jacobucci*, 189 Colo. at 387, 541 P.2d at 672. This is so because a mutual ditch company is "merely the vehicle by which its owners operate and manage its affairs" and is "organized solely for the convenience of its members in the management of the irrigation and reservoir systems." *Jacobucci*, 189 Colo. at 387, 541 P.2d at 672 (citing *Billings Ditch Co. v. Indus. Comm'n*, 127 Colo. 69, 74, 253 P.2d 1058, 1060 (1953)).

¶ 37 "Because shareholders in a mutual ditch company own a right to apply water to a beneficial use instead of merely owning shares of corporate stock, ditch company shares are considered real property rather than personal property." *Left Hand Ditch Co. v. Hill*, 933 P.2d 1, 3–4 (Colo.1997). Thus, ownership of the mutual ditch stock "is

merely incidental to the ownership of the water rights by the shareholders." *Jacobucci*, 189 Colo. at 387, 541 P.2d at 672. Likewise, "mutual ditch companies are not 'true' corporations in a legal sense but merely vehicles for individual ownership of water rights." *Fort Lyon Canal*, 720 P.2d at 141; *see also* § 4–9–604(b)(2), C.R.S.2011 (recognizing that when a real property interest is encumbered, a secured party may proceed in accordance with any rights "with respect to real property").

¶ 38 The Allens submitted no evidence to the trial court to show that mutual ditch shares are "commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment," as required by the statutory definition of a "certificated security." Ch. 68, sec. 1, § 4–8–102(1)(b)(II), 1981 Colo. Sess. Laws 352. Lacking such evidence, we are left with the common understanding of such shares derived from Colorado case law, which leads us to conclude that mutual ditch shares do not meet this statutory definition. Accordingly, we need not determine whether mutual ditch shares meet the other statutory requirements. Thus, the UCC does not control the requirements associated with recording and transferring mutual ditch stocks. *See Gallegos v. Graff*, 32 Colo.App. 213, 214, 508 P.2d 798, 799 (1973) (the UCC does not apply to the transfer of interests in real property). Rather, because mutual ditch shares are "specific interests in water rights, which are real property interests," we turn to established real property principles provided by Colorado statutes and case law. *Great Western*, 681 P.2d at 491.

### V. Common Law and Statutory Notice Requirements

¶ 39 As we understand the Allens' argument, if we decline to apply the UCC, they contend that the common law required Mesa Land Trust to obtain permission from Big Creek, and possibly all of its shareholders, and to comply with Big Creek's bylaws, all in order to encumber the Big Creek shares. We reject this argument because it is contrary to well-established law.

¶ 40 Because mutual ditch shares are water rights, which are real property interests, *Great Western*, 681 P.2d at 491–92, they are subject to notice and recording requirements provided by sections 38–35–106(1) and 38–35–109, C.R.S.2011. *See also* § 4–9–604(b)(2).[6] Pursuant to the statutory requirements, a deed encumbering real property interests is effective against subsequent purchasers when it is recorded with the county clerk. §§ 38–35–106(1), 38–35–109. As long as the deed is properly recorded, "subsequent purchasers have an obligation to find it at the county clerk and recorder's office and are considered to have constructive notice of it, even if they do not locate it." *Franklin Bank v. Bowling*, 74 P.3d 308, 314 (Colo.2003) (quoting 14 Richard R. Powell, *Powell on Real Property* § 82.03[2][b][ii] (Michael Allan Wolf ed. 2003)); *accord Guaranty Bank & Trust Co. v. LaSalle Nat'l Bank Ass'n*, 111 P.3d 521, 523 (Colo.App. 2004).

¶ 41 The conservation easement statute contains these same notice requirements. A properly recorded conservation easement deed provides notice to subsequent purchasers of the restrictions it contains. § 38–30.5–106. Thus, contrary to the Allens' position, actual notice of the encumbrance is not required. Additionally, we find no support for the Allens' position that Big Creek and its shareholders were required to be notified of the conservation easements before their conveyance.[7]

---

6. The version of the notice and recording statutes that existed when the easement was created in 1990 applies to the Big Creek shares. The portions of the statute relevant to our analysis remain unchanged.

7. The Allens rely on *Jacobucci*, 189 Colo. at 387–88, 541 P.2d at 672, to support their argument that the mutual ditch shares could not be encumbered without notice to the shareholders. We are not persuaded by the Allens' reasoning that, because mutual ditch shareholders are unlike corporate shareholders, the notice and recording requirements for a deed (or easement) encumbering mutual ditch shares are different from the requirements for other deeds (or easements) encumbering real property.

¶ 42 Here, the United States was the record owner of the property and the Big Creek shares when it conveyed the conservation easement by deed to Mesa Land Trust in 1990. The conveyance document states the grantor's intent that "[a]ll water rights held at the date of this conveyance shall remain with this land." As explained in sections III and IV above, the mutual ditch shares are water rights, and are thus encumbered by the 1990 Easement. Accordingly, we conclude that the Allens were properly notified of the encumbrance on the Big Creek shares when they purchased the property in 1993.

¶ 43 The trial court's judgment is affirmed.

Judge TERRY and Judge BOORAS concur.