Colorado Court of Appeals Opinions || December 31, 2015


Colorado Court of Appeals -- December 31, 2015
2015 COA 180. No. 14CA0390. Williams v. Department of Public Safety, Colorado State Patrol.



 
 
 
 COLORADO COURT OF APPEALS

 
 2015 COA 180

 
 



 Court of Appeals No. 14CA0390
 State Personnel Board No. 2011G028


 Brett L. Williams,

 Petitioner-Appellee and Cross-Appellant,

 v.

 Department of Public Safety, Colorado State Patrol,

 Respondent-Appellant and Cross-Appellee,

 and

 State Personnel Board,

 Appellee.


 ORDER AFFIRMED IN PART, REVERSED IN PART,
 AND CASE REMANDED WITH DIRECTIONS

 Division III
 Opinion by JUDGE WEBB
 Fox, J., concurs
 Berger, J., concurs in part and dissents in part

 Announced December 31, 2015


 Donachy Law Firm, LLC, Mary Donachy, Denver, Colorado; Scott Moss, Denver, Colorado, for Plaintiff-Appellee and Cross-Appellant

 Cynthia H. Coffman, Attorney General, Stacy L. Worthington, Senior Assistant Attorney General, Denver, Colorado, for Defendant-Appellant and Cross-Appellee

 Cynthia H. Coffman, Attorney General, Eric H. Maxfield, First Assistant Attorney General, Denver, Colorado, for Appellee

 Â 


 
 Â¶1Â Â Â Â Â Â Â Â  Brett L. Williams spent twelve years as a Colorado State Patrol (CSP) employee, climbing the ranks from trooper to captain. In 2010, he resigned from CSP to start a new career as a helicopter pilot. But when Williams applied for reinstatement just three months later, his most closely-guarded secret â he is gay â was revealed. After Williams failed a polygraph examination and a swift investigation concerning some of his responses, CSP refused to reinstate him. But was that decision illegal discrimination based on Williamsâ sexual orientation?
 
 I. Background
 
 A. Procedure
 
 Â¶2Â Â Â Â Â Â Â Â  Williams filed a complaint with the State Personnel Board (Board). The complaint alleged that CSP had acted arbitrarily or capriciously and that it had discriminated against him on the basis of sexual orientation in violation of the Colorado Anti-Discrimination Act (CADA), sections 24-34-401 to -406, C.R.S. 2015. The Board referred the complaint to an administrative law judge (ALJ) for hearing.
 
 Â¶3Â Â Â Â Â Â Â Â  After a five-day evidentiary hearing, the ALJ issued an initial decision with detailed factual findings that concluded that CSPâsÂ actions were arbitrary, capricious, and constituted unlawful discrimination based on sexual orientation. She awarded Williams front pay in lieu of reinstatement, back pay, attorney fees, and costs in amounts to be determined following action by the Board.


 
 Â¶4Â Â Â Â Â Â Â Â  CSP appealed the initial decision to the Board. It affirmed all of the AUJâs conclusions and findings except for one: that CSPâs culture was anti-gay. The Board then remanded the case for the AUJ to determine remedies.
 
 Â¶5Â Â Â Â Â Â Â Â  After another evidentiary hearing, the AUJ issued an amended order awarding Williams $172,742 in back pay and $595,526 in front pay. Both parties appealed and the Board affirmed. Then CSP appealed and Williams cross-appealed to this court.
 
 B. Facts
 
 Â¶6Â Â Â Â Â Â Â Â  Williams began his career with CSP in 1998 as a trooper. His performance evaluations were consistently exceptional. He received several promotions over the next twelve years, ultimately becoming a captain. Throughout his tenure, Williams kept his sexual orientation secret, even to the point of displaying a photograph of a supposed girlfriend on his desk.


 
 Â¶7Â Â Â Â Â Â Â Â  But after an involuntary transfer to a desk position that he did not âcare for,â Williams resigned in 2010. Before leaving, according to Williams, Major James Colley â his then immediate supervisor â assured him that if he returned to the force within a year, the reapplication process would be streamlined such that Williams would not have to undergo a polygraph examination and a full background check.
 
 Â¶8Â Â Â Â Â Â Â Â  Three months later, Williams applied for reinstatement. James Wolfinbarger, the new chief, required Williams to complete a full background check and take a polygraph examination. This requirement was a change in policy from that of Wolfinbargerâs predecessor.
 
 Â¶9Â Â Â Â Â Â Â Â  During the pre-polygraph interview, Williams made two disclosures to examiner Sergeant Dean Paxton that became significant.
 
 Â¶10First, Williams described having once inadvertently viewed child pornography on an adult pornography website. When he realized that some of the actors were children, he explained that he had clicked out of the video and reported the video to the website administrator.


 
 Â¶11Â Â Â Â Â Â Â Â  Second, Williams revealed that a massage in Thailand in 2006 âended in sexual contact.â Paxton asked Williams whether the âmasseuseâ was male or female; Williams responded male. CSPâs polygraph policies prohibited asking questions to elicit an examineeâs sexual orientation.
 
 Â¶12Â Â Â Â Â Â Â Â  Williams testified that revealing information related to his sexual orientation during this interview heightened his anxiety during the examination. When Paxton asked whether Williams was concealing any unlawful sexual conduct, and he responded âno,â the polygraph showed a âsignificant reaction,â the highest Paxton had ever seen. Based on this reaction, Paxton concluded that Williams had failed the polygraph.
 
 Â¶13Â Â Â Â Â Â Â Â  Wolfinbarger soon learned about Williamsâ admissions during the interview and failed examination. He instructed Captain Dan Elder to find out whether CSP could deny reinstatement based solely on the polygraph results. Elder delegated this assignment to Sergeant Tim Keeton. After doing some research, Keeton told Elder that CSP could deny reinstatement based only on the polygraph results, although he also knew that denying reinstatement on this basis was not the best practice.


 
 Â¶14Â Â Â Â Â Â Â Â  Elder reported Keetonâs conclusion to Wolfinbarger. Lieutenant Colonel Scott Hernandez, in consultation with Wolfinbarger, decided not to reinstate Williams. Colley then told Williams that he would not be reinstated. Due to an intervening holiday and a furlough day, the process from examination to decision took about three business days.
 
 II. Arbitrary or Capricious Claim
 
 Â¶15Â Â Â Â Â Â Â Â  CSP first contends the Board did not have authority to review Williamsâ claim that CSP acted arbitrarily or capriciously in declining to reinstate him. Alternatively, CSP contends the record lacks sufficient evidence to support the ALJâs conclusion of an arbitrary or capricious hiring decision. Because we agree with CSPâs first contention, its second contention is moot.
 
 A. Preservation and Standard of Review
 
 Â¶16Â Â Â Â Â Â Â Â  The parties agree that this issue is preserved.
 
 Â¶17Â Â Â Â Â Â Â Â  Appellate courts review an agencyâs determination of its own jurisdiction de novo. Hawes v. Colo. Div. of Ins., 65 P.3d 1008, 1015 (Colo. 2003). Still, they generally defer to the agencyâs reasonable interpretations of its own statutes. Gessler v. Colo. Common Cause, 2014 CO 44, Â¶7. Specifically, if the statute isÂ silent or ambiguous, âcourts must consider whether the agencyâs regulation is based on a permissible construction of the statute.â Xerox Corp. v. Bd. of Cty. Commârs, 87 P.3d 189, 192 (Colo. App. 2003). But an appellate court does not defer to an agency interpretation that violates the plain language of the statute or the General Assemblyâs intent. Youngs v. Indus. Claim Appeals Office, 2012 COA 85M, Â¶22.


 
 B. Law
 
 1. Comparing Board and Director Authority
 
 Â¶18Â Â Â Â Â Â Â Â  The Board has authority to review adverse actions involving state employees. See Colo. Const. art. XII, Â§ 13(8) (â[p]ersons in the personnel system of the stateâ). But its power to review nonemployee appointment decisions arises from a single statute: section 24-50-125.3, C.R.S. 2015 (â[a]n applicant or employeeâ). This section permits the Board to review a âdiscriminatory or unfair employment practice[]â as defined in CADA. Id. But it does not empower the Board to consider a nonemployeeâs claim of arbitrary or capricious action. See id.
 
 Â¶19Â Â Â Â Â Â Â Â  By contrast, the State Personnel Director (Director) has express statutory authority to review an appeal from â[a]ny person,âÂ which would include nonemployees. Â§ 24-50-112.5(4)(a), C.R.S. 2015. And section 24-50-112.5(4)(b) grants the Director authority to overturn any action found to have been âarbitrary, capricious, or contrary to rule or law.â


 
 Â¶20Â Â Â Â Â Â Â Â  True enough, the Board has statutory authority to reverse or modify a determination by the Director should the Board conclude that either the action of the Director or that of the appointing authority whose action the Director reviewed was arbitrary or capricious. Â§ 24-50-103(6), C.R.S. 2015.[1] But the claim must be âappealable to the [B]oard pursuant to this article or the state constitutionâ for the Board to review it under section 24-50-103(6). Id.


 Â¶21Â Â Â Â Â Â Â Â  A close look at the statutory framework shows the possibility of two separate but parallel appeals â one directly to the Board from an allegedly discriminatory action by an appointing authority and one to the Director from an allegedly arbitrary or capricious action by an appointing authority. See Ch. 351, sec. 15, Â§ 24-50-112.5(4)(c) & (d), 2010 Colo. Sess. Laws 1626-27 (explaining that if any employee who has filed an appeal with the Director also files an appeal with the Board arising from the same action by an appointing authority, then the ninety-day period within which the Director must issue a written decision will be tolled until the Boardâs final decision, if both appeals arise from the same action). Thus, âall complaints about the selection . . . process not involving allegations of discrimination are to be filed with the director, while any claims of discrimination with respect to that process must be filed with the board or the civil rights division.â Cunningham v. Depât of Highways, 823 P.2d 1377, 1380 (Colo. App. 1991).

 
 2. Statutory Construction Principles
 
 Â¶22Â Â Â Â Â Â Â Â  Appellate courts first look to the General Assemblyâs chosen language to discern the legislative intent. See Steedle v. Sereff, 167Â P.3d 135, 140 (Colo. 2007). The court must âgive effect to the General Assemblyâs choice of wording.â Colo. Depât of Pers. v. Alexander, 970 P.2d 459, 465 (Colo. 1998). When the language is plain, the court must apply the text as written and not force or strain its interpretation. Welby Gardens Co. v. Adams Cty. Bd. of Equalization, 56 P.3d 1121, 1123 (Colo. App. 2002), affâd, 71 P.3d 992 (Colo. 2003).


 
 C. The AUJâs Determination
 
 Â¶23Â Â Â Â Â Â Â Â  The AUJ concluded that she had authority to review Williamsâ claim that CSP had acted arbitrarily or capriciously.
 
 Â¶24Â Â Â Â Â Â Â Â  In the initial order, she first explained that section 24-50-125.3 â permitting a nonemployee, like Williams, to appeal a discriminatory action to the Board â does not âplace a limit on the Boardâs commensurate jurisdiction under Â§ 24-50-103(6).â Thus, according to the AUJ, when the Board reviews allegedly discriminatory actions under section 24-50-125.3, âthere is a rebuttable presumption that the Board may [also] reverse or modify the action if it finds it to have [also] been arbitrary [or] capricious[.]â Next, the AUJ interpreted the tolling provisions to permit applicants to select their appellate forum. Finally, the AUJ concluded thatÂ requiring a nonemployee to pursue two separate appeals â an arbitrary or capricious claim to the Director and a discrimination claim to the Board â produced an âuntenable resultâ in terms of judicial economy.


 
 Â¶25Â Â Â Â Â Â Â Â  The Board affirmed the ALJâs conclusion without additional analysis.
 
 D. Application
 
 1. Statutory Construction
 
 Â¶26Â Â Â Â Â Â Â Â  Although the Board lacks express authority to review a nonemployeeâs claim that the appointing authority was arbitrary or capricious, it argues that reading the plain language of several provisions together at least implies this power. The applicable language of section 24-50-103(6) â permitting the Board to reverse arbitrary or capricious actions if the claim was âappealable to the boardâ â and section 24-50-125.3 â permitting the Board to review nonemployee discrimination claims â stems from the same bill. See Ch. 194, sec. 2, Â§ 24-50-103(6), 1984 Colo. Sess. Laws 705 (amending section 24-50-103(6)); Ch. 194, sec. 11, Â§ 24-50-125.3, 1984 Colo. Sess. Laws 712-13 (adding section 24-50-125.3). For this reason, the Board asserts that we should construe theseÂ provisions together. See Buck v. Dist. Court, 199 Colo. 344, 347-48, 608 P.2d 350, 352 (1980) (two statutes, enacted contemporaneously, should be construed together).


 
 Â¶27Â Â Â Â Â Â Â Â  The result, according to the Board, is that because it may review appeals by nonemployees under section 24-50-125.3, those claims are âappealable to the boardâ as required by section 24-50-103(6), and thus they can be reviewed under the âarbitrary [or] capriciousâ language in the latter section. The Board also points out that when the General Assembly enacted section 24-50-125.3, it did not limit the Boardâs jurisdiction in section 24-50-103(6).
 
 Â¶28Â Â Â Â Â Â Â Â  But this analysis ignores the difference in the scope of the Boardâs review between section 24-50-125.3 and section 24-50-103(6). On the one hand, section 24-50-125.3 empowers the Board to review appeals â including those by nonemployees â for allegedly discriminatory action. Thus, only discrimination claims are âappealable to the boardâ under section 24-50-103(6). On the other hand, section 24-50-103(6) empowers the Board to review such appealable claims for, as relevant here, action that is âarbitrary [or] capricious.â But the Board does not explain, nor canÂ we discern, how section 24-50-103(6) could expand its review for discriminatory action into a review for arbitrary or capricious action.


 
 Â¶29Â Â Â Â Â Â Â Â  Although section 24-34-301, C.R.S. 2015, does not define discrimination, the term has a well-understood meaning in the employment context. See, e.g., Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 682 n.22 (1983) (discrimination means âless favorableâ treatment on a statutorily prohibited basis). In contrast, an administrative agency has acted arbitrarily or capriciously where âno substantial evidence exists in the record to support the agencyâs decision.â Gessler v. Grossman, 2015 COA 62, Â¶39.
 
 Â¶30Â Â Â Â Â Â Â Â  The Boardâs interpretation would conflate these fundamentally different inquiries. This interpretation would leave one to wonder whether the Board could uphold an appointing authorityâs action for insufficient evidence of less favorable treatment, but then overturn the action because the evidence showed that the appointing authority had acted arbitrarily or capriciously.
 
 Â¶31Â Â Â Â Â Â Â Â  No provision precludes Board review of a nonemployeeâs claim that the appointing authority acted arbitrarily or capriciously. ButÂ section 24-50-112.5(4)(a)-(b) grants the Director express authority to do just that. And âwhen the [General Assembly] includes a provision in one statute, but omits that provision from another similar statute, the omission is evidence of its intent.â Deutsch v. Kalcevic, 140 P.3d 340, 342 (Colo. App. 2006). Thus, we should not infer that the General Assembly intended to implicitly provide the Board with the same authority that it expressly provided to the Director.


 
 Â¶32Â Â Â Â Â Â Â Â  To be sure, where an appointing authorityâs action is challenged on multiple grounds, the Board and the Director may have overlapping appellate authority in some respects. See Â§ 24-50-112.5(4)(c)-(d) (describing appellate process if complainant files appeals with both the Director and the Board). But the General Assembly did not merge the Directorâs authority into that of the Board. To do so â as the Board urges â would add words to these statutes. This an appellate court cannot do. See Bedee v. Am. Med. Response of Colo., 2015 COA 128, Â¶39.
 
 Â¶33Â Â Â Â Â Â Â Â  As well, interpreting the statutory framework as the AUJ did â permitting aggrieved nonemployees to select their forum for claims alleging arbitrary or capricious action â impermissibly stretchesÂ the text in another way. Sections 24-50-112.5(4)(c) and (d) â tolling the time in which the Director must issue a decision until the Board has reached a final decision â assume that even if the aggrieved applicant appealed to the Board, the Director could still have a question to resolve. And as relevant here, that question could be the merits of a nonemployeeâs claim the appointing authority was arbitrary or capricious, because the Director has express authority to consider such a claim. See Â§ 24-50-112.5(4)(b).


 
 Â¶34Â Â Â Â Â Â Â Â  As for judicial economy, policy considerations are subordinate to giving effect to unambiguous statutory language. See Swieckowski by Swieckowski v. City of Ft. Collins, 934 P.2d 1380, 1387 (Colo. 1997) (â[W]e are constrained by limiting principles of judicial review to interpret statutory language consistently with the intent of the General Assembly and with the plain meaning of the words chosen by this body when it enacts a statute. We may not substitute our view of public policy for that of the General Assembly.â); People in the Interest of D.R.W., 91 P.3d 453, 458 (Colo. App. 2004) (âWe reject policy considerations in favor of the plain language of the statute.â). And by tolling the Directorâs deadlineÂ until âfinal agency actionâ by the Board, the statute recognizes that a redundant decision by the Director might be avoidable if both appeals arose from the same appointing authorityâs action.


 
 Â¶35Â Â Â Â Â Â Â Â  Undaunted, the Board points out that section 24-50-112.5(4)(e) permits âany personâ to file an appeal to the Board after the Directorâs final decision. The Board argues that this section negates the Directorâs exclusive authority over claims alleging arbitrariness or capriciousness when discrimination is also alleged. But this section became effective after the ALJ had determined that she had authority to review Williamsâ claim CSP acted arbitrarily or capriciously. Ch. 260, sec. 9, Â§ 24-50-112.5(4)(e), 2012 Colo. Sess. Laws 1350 (effective January 1, 2013). Thus, it does not illuminate interpretation of the statutes that existed during Williamsâ administrative proceedings. See Boulder Med. Ctr. v. Moore, 651 P.2d 464, 466 (Colo. App. 1982) (â[B]ecause this statute was not in effect at the time of Mooreâs termination and at the time of trial, and because retrospective application is forbidden in the absence of plain language, this section does not apply here.â).
 
 2. Deference


 
 Â¶36Â Â Â Â Â Â Â Â  Recall that when a statute âis silent or ambiguous with respect to a specific issue, courts must consider whether the agencyâs regulation is based on a permissible construction of the statute.â Xerox Corp., 87 P.3d at 192. An ambiguous statute is one âfairly susceptible of more than one interpretation.â Miller v. Indus. Claim Appeals Office, 985 P.2d 94, 96 (Colo. App. 1999).
 
 Â¶37Â Â Â Â Â Â Â Â  In contrast, here the statutory scheme unambiguously grants the Director authority over claims of an arbitrary or capricious action. It does not grant that same authority to the Board. As well, the statutes are not silent on the Boardâs authority to review nonemployee claims: the Board may review such claims alleging discrimination or other unfair employment practices âas defined in part 4 of article 34.â Â§ 24-50-125.3.
 
 Â¶38Â Â Â Â Â Â Â Â  Finally, the Boardâs rules do not grant it authority to consider claims alleging arbitrary or capricious action. Rule 8-42 says that claims with no allegations of discrimination shall be filed with the Director. Depât of Pers. & Admin. Rule 8-42, 4 Code Colo. Regs. Â§ 801-1 (2011). But the then-applicable Rule 8-46(A) gave the Board discretion to grant a hearing in claims alleging discriminationÂ âwhere there is no mandatory right to a hearing, including discrimination in the selection and examination process[.]â Depât of Pers. & Admin. Rule 8-46(A), 4 Code Colo. Regs. Â§ 801-1 (2011).


 
 Â¶39Â Â Â Â Â Â Â Â  Given all this, we conclude that the Board lacked authority to review Williamsâ claim CSP acted arbitrarily or capriciously.
 
 E. Remand
 
 Â¶40Â Â Â Â Â Â Â Â  Section 24-50-112.5(4)(a) grants an aggrieved applicant ten days to appeal an appointing authorityâs decision to the Director. But the Board points out â and CSP does not dispute â that this time âdoes not run if the notice did not properly advise the employee of his or her right to appeal.â Renteria v. Colo. State Depât of Pers., 811 P.2d 797, 802 (Colo. 1991); see also Cunningham, 823 P.2d at 1380.
 
 Â¶41Â Â Â Â Â Â Â Â  CSPâs letter notifying Williams that he would not be reinstated failed to explain Williamsâ right to appeal to the Director. Thus, we remand Williamsâ claim CSP acted arbitrarily or capriciously to the Board for referral to the Director, who may consider whether the claim has been tolled by lack of notice. If the Director so concludes, then the Director may consider the merits of the claim. However, because the Board set aside the refusal to reinstate asÂ discriminatory and we are upholding its decision, the Director may instead conclude that Williamsâ claim that CSP acted arbitrarily or capriciously has become moot.


 
 III. Discrimination
 
 Â¶42Â Â Â Â Â Â Â Â  CSP next contends the record lacks sufficient evidence to support the ALJâs conclusion that CSP discriminated against Williams based on his sexual orientation. We discern ample record support to affirm the ALJâs conclusion.
 
 A. Preservation and Standard of Review
 
 Â¶43Â Â Â Â Â Â Â Â  Williams agrees that CSP preserved this contention.
 
 Â¶44Â Â Â Â Â Â Â Â  A reviewing court will not reverse an administrative agencyâs decision âunless the agency acted in an arbitrary and capricious manner, made a determination that is unsupported by the evidence and the record, erroneously interpreted the law, or exceeded its constitutional or statutory authority.â Colo. Citizens for Ethics in Govât v. Comm. for the Am. Dream, 187 P.3d 1207, 1214 (Colo. App. 2008).
 
 B. Law
 
 Â¶45Â Â Â Â Â Â Â Â  Under CADA, a prima facie discrimination case requires proof that (1) the employee belongs to a protected class; (2) the employeeÂ was qualified; (3) despite being qualified, the employee suffered adverse employment action; and (4) the circumstances give rise to an inference of discrimination based on membership in the protected class. St. Croix v. Univ. of Colo. Health Sci. Ctr., 166 P.3d 230, 236 (Colo. App. 2007); see also Colo. Civil Rights Commân v. Big O Tires, Inc., 940 P.2d 397, 400 (Colo. 1997).


 
 Â¶46Â Â Â Â Â Â Â Â  If the employee establishes a prima facie case, the burden shifts to the employer to âarticulate some legitimate, nondiscriminatory reason for the employment decision.â St. Croix, 166 P.3d at 236; see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973) (describing burden shifting analysis under Title VII).[2] Then if the employer provides a legitimate, nondiscriminatory reason for its actions, the employee must show that the employerâs reason was a pretext for discrimination. St. Croix, 166 P.3d at 236 (citing Big O Tires, Inc., 940 P.2d at 401).
 
 Â¶47Â Â Â Â Â Â Â Â  Over the ensuing decades, several refinements of the McDonnell Douglas paradigm have emerged. As relevant here,Â where the plaintiff cannot show that the decisionmaker acted with animus against members of a protected group, intentional discrimination may still be proven under the âcatâs pawâ theory. Thomas v. Berry Plastics Corp., 803 F.3d 510, 514 (10th Cir. 2015) (Title VII). This theory allows the employee to make a prima facie case with evidence that âa biased subordinate who lacked decisionmaking power used the formal decisionmaker as a dupe in a deliberate scheme to bring about an adverse employment action.â Id. at 515.


 
 C. Application
 
 Â¶48Â Â Â Â Â Â Â Â  After making detailed findings, the AUJ concluded that Williams had established all four prongs of the prima facie case for intentional discrimination and that CSPâs proffered reasons for denying reinstatement were pretextual. The AUJ also concluded that Williams had proven CSP discriminated under the catâs paw theory. CSP disputes each of these conclusions, but focuses primarily on the fourth prong and the AUJâs reliance on the catâs paw theory.


 
 1. Circumstances Giving Rise to an Inference of Intentional
 Discrimination
 
 Â¶49Â Â Â Â Â Â Â Â  To establish the fourth prong of the prima facie case, the employee need not have conclusive proof â such as an admission â that the employer intentionally discriminated. See Plotke v. White, 405 F.3d 1092, 1101 (10th Cir. 2005) (describing prima facie burden as âde minimisâ under Title VII). Rather, âthe fourth element of a prima facie case is a flexible one that can be satisfied differently in varying scenarios.â Id. at 1100. For example, sufficient evidence may show that the employer engaged in actions or remarks which âcould be viewed as reflecting a discriminatory animus.â Id. at 1101 (quoting Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996) (Title VII)). And âthe timing or sequence of events leading to plaintiffâs [adverse hiring result]â can also give rise to an inference of intentional discrimination. Id. (quoting Chertkova, 92 F.3d at 91).
 
 Â¶50Â Â Â Â Â Â Â Â  The AUJ relied on the following factual findings in concluding that CSPâs actions gave rise to an inference of intentional discrimination.Â 


 
 Â¶51Â Â Â Â Â Â Â Â  First, Williamsâ employment record at CSP had been exemplary. His job performance evaluations were consistently âexceptional,â and he climbed the ranks from trooper to captain in fewer than seven years.
 
 Â¶52Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â  Second, despite Williamsâ impeccable record, CSPâs decision to refuse reinstatement was swift. At most, three business days passed between the failed polygraph examination and the final decision. But the AUJ found that â[CSP] offered no explanation for expediting the process of denying reinstatement.â
 
 Â¶53Â Â Â Â Â Â Â Â  Third, when Williams applied for reinstatement, Keeton, Elder, Hernandez, and Wolfinbarger all had some reasons to believe that Williams was gay. In April 2009, two of Williamsâ subordinates â Corporal Shawn Wycoff and Sergeant Pat Mullenburg â told Williams that Sergeant Darryl Brown had made disparaging comments about Williamsâ sexuality. Williams reported the incident to Elder. Keeton investigated the complaint, Hernandez performed a âfinal reviewâ of Elderâs report, and Wolfinbarger was listed as a recipient of the complaint and Keetonâs report. And after Williams sought reinstatement, both Keeton and Elder observed the pre-polygraph interview in which Williams told the examiner that whileÂ in Thailand he had sexual contact with a man. They also both observed the examination.


 
 Â¶54Â Â Â Â Â Â Â Â  The manner in which Elder handled the complaint about Brown also permits an inference of animus against gay men. Wycoff explained that after he and Mullenburg reported Brownâs comments regarding Williams, Wycoff was âdrilled pretty hardâ and that he was made to feel that he had done something wrong. Wycoff concluded that he would decline to report âan anti-gay remarkâ again based on how he was treated.
 
 Â¶55Â Â Â Â Â Â Â Â  Because the record supports these findings, we agree with the AUJ that they permit the inference that CSP intentionally discriminated against Williams based on his sexual orientation. Although CSP correctly points out that Williams did not present direct evidence of discriminatory intent, indirect proof suffices because discrimination âis as sly as it is insidious. It lives in inference, tone, and gesture as much as in action.â Valdez v. People, 966 P.2d 587, 599 (Colo. 1998) (Kourlis, J., dissenting); see also Bodaghi v. Depât of Nat. Res., 995 P.2d 288, 296 (Colo. 2000) (noting that employees must often rely on indirect evidence of discrimination because âdirect evidence of discrimination is rareâ).
 
 2. Pretext


 
 Â¶56Â Â Â Â Â Â Â Â  Where an employer responds to an employeeâs prima facie case with evidence of a legitimate, nondiscriminatory reason for its action, showing that the reason was pretextual does ânot require a plaintiff to offer any direct evidence of actual discrimination.â Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1113 (10th Cir. 2007). Instead, the employee may show pretext based on âweaknesses, implausibilities, inconsistencies, incoherencies, or contradictionsâ in the employerâs explanation. Id. (quoting Morgan v. Hilti Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)). For example, the timing and sequence of events leading up to the adverse action, as well as post-hoc justifications, can be evidence of pretext. Plotke, 405 F.3d at 1103, 1105.
 
 Â¶57Â Â Â Â Â Â Â Â  CSP presented evidence of the following nondiscriminatory reasons for having denied reinstatement: Williamsâ âsignificant reactionâ to the polygraph question about illegal sexual conduct, his admitted sexual contact in Thailand, and his inadvertently having viewed child pornography. But the AUJ concluded that these reasons were merely a pretext for intentional discrimination. TheÂ record includes evidence of the following facts, which support this conclusion.


 
 a. Procedural Irregularities and Disparate Treatment
 
 Â¶58Â Â Â Â Â Â Â Â  Requiring Williams to take the polygraph examination was a departure from the previous chiefâs policy. Before Williams resigned, Colley told him that he would not need to take a polygraph if he applied for reinstatement within a year. But when Colley called Williams to tell him he would not be reinstated and Williams pointed out their previous conversation about reinstatement, Colley said only that the requirements for reinstatement were up to the new chief.
 
 Â¶59Â Â Â Â Â Â Â Â  The observation by Keeton and Elder of Williamsâ polygraph examination was atypical. Elder testified that he could not remember another time that both he and Keeton had observed an examination together. And while Keeton recalled having previously observed examinations with Elder, the AUJ found that his testimony was not credible.
 
 Â¶60Â Â Â Â Â Â Â Â  As well, the pre-polygraph interview violated CSP policies that prohibit examiners from formulating questions to elicit the examineeâs sexual orientation. Despite this policy, after WilliamsÂ told Paxton that while in Thailand he had a sexual encounter during a massage, Paxton asked the gender of the âmasseuse.â Paxton testified that he could not recall another polygraph examination in which he had asked about the gender of a sexual partner. And after learning the gender, Paxton elicited further details about the sexual encounter. Yet, following the examination, neither Elder nor Keeton addressed with Paxton the impropriety of this question or his departure from policy.


 
 Â¶61Â Â Â Â Â Â Â Â  CSPâs response to Williamsâ failing the polygraph examination was inconsistent with its past practices. The record shows that at least three other CSP applicants or reinstatement candidates failed polygraph examinations between January 12, 2009, and June 14, 2010. But CSP still hired them. And CSP does not highlight any differences between Williams and these candidates other than that Williams had a more âsignificant reactionâ during the polygraph examination.
 
 Â¶62Â Â Â Â Â Â Â Â  In any event, this strong reaction is consistent with Williamsâ letter to Wolfinbarger explaining that after the pre-polygraph question disclosed the sex of the masseur, the test question aboutÂ âconcealing any unlawful sexual conductâ left him extremely nervous and anxious, given his sexual orientation.


 
 Â¶63Â Â Â Â Â Â Â Â  Yet despite this explanation, the record also shows that CSP never even considered retesting Williams. But testimony showed that another former trooper who had sought reinstatement failed a polygraph, was retested, and then was reinstated. CSP counters that Williams did not provide evidence of any applicants who were treated more favorably concerning their polygraphs and were similarly situated to him. But the other applicants were similar to Williams in that they all failed a polygraph. However, that failed polygraph was not fatal for them; it was fatal for Williams.
 
 b. Timing and Sequence
 
 Â¶64Â Â Â Â Â Â Â Â  The timing of CSPâs decision is also suspect. Following the polygraph examination, Elder was charged with determining whether CSP could deny Williams reinstatement based solely on the results. And at Wolfinbargerâs direction, the investigation was to be expedited.
 
 Â¶65Â Â Â Â Â Â Â Â  Elder delegated this research to Keeton, who took no notes on his inquiries. Keeton testified that he read policies for police departments in Austin, Texas, and Los Angeles, California; neither department would deny reinstatement based solely on a polygraph examination. But Keeton did not remember providing copies of these policies to Elder. Paxton testified to having told Keeton best practice was not to base hiring decisions solely on a polygraph examination, and Paxton recalled that Keeton agreed with him. Keeton did not contact the Colorado Attorney Generalâs Office during the investigation, nor did he seek input from human resources.
 
 Â¶66Â Â Â Â Â Â Â Â  Despite all this, Keeton told Elder that CSP could decline to reinstate Williams based on one district court case from Colorado Springs and his conversation with an attorney in that case. After having received Keetonâs conclusion, Elder, too, did not contact the Colorado Attorney Generalâs Office or human resources.
 
 c.Â  Post-Hoc Justifications
 
 Â¶67Â Â Â Â Â Â Â Â  Colley told Williams only that because he had failed the polygraph, CSP would not reinstate him. During litigation, however, Wolfinbarger justified the decision based on all of the facts âin totality,â including the âact of prostitutionâ in Thailand and Williams having viewed child pornography. Yet, in the pre-polygraph examination, after Williams disclosed the inadvertentÂ child pornography viewing, Paxton diminished the event, stating âeverybody has seen pornâ and âno problem.â


 
 Â¶68Â Â Â Â Â Â Â Â  Wolfinbarger and Hernandez also testified that they feared Williams would view pornography in his patrol car if left alone, a justification the ALJ found not credible. And Hernandez noted Williamsâ hesitancy to take the polygraph examination. But Colley had told Williams that he would not have to be polygraphed.
 
 Â¶69Â Â Â Â Â Â Â Â  In sum, we conclude that the record supports the ALJâs determination of pretext.
 
 3. Catâs Paw/Subordinate Bias Liability
 
 Â¶70Â Â Â Â Â Â Â Â  Recall that under the catâs paw theory, an employer may be liable â even if the decisionmakers lacked any discriminatory intent â where they relied solely on the reports or recommendations of a biased subordinate. See EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 485 (10th Cir. 2006). But the subordinate must do more than just influence or provide input into the decisionmaking process. Id. at 487. Rather, âthe issue is whether the biased subordinateâs discriminatory reports, recommendation, or other actions caused the adverse employment action.â Id. (emphasis added). Thus, an employer can âavoidÂ liability by conducting an independent investigation of the allegations against an employee.â Id. at 488.


 
 Â¶71Â Â Â Â Â Â Â Â  Hernandez and Wolfinbarger made the decision not to reinstate Williams. They both denied believing that Williams was gay during the reinstatement process. As explained above, the record calls their denial into question because both of them had access to Williamsâ complaint and the accompanying investigation regarding Brownâs derogatory statements about Williamsâ sexuality.
 
 Â¶72Â Â Â Â Â Â Â Â  But even if Wolfinbarger and Hernandez did not know or have reason to suspect that Williams was gay during the reinstatement process, they both relied on the results of the expedited investigation by Elder and Keeton. Neither Wolfinbarger nor Hernandez sought independent confirmation that CSP could deny reinstatement based solely on the results of a polygraph. And like Keeton and Elder, neither of them contacted human resources or the Attorney Generalâs office to inquire whether CSP could do so. Nor did either Wolfinbarger or Hernandez discuss the results of the polygraph examination with Williams before deciding not to reinstate him.


 
 Â¶73Â Â Â Â Â Â Â Â  For these reasons, the record shows that they accepted the conclusions of biased subordinates. Thus, the ALJ properly concluded that CSP is liable under the catâs paw theory of liability.
 
 IV. Front Pay
 
 Â¶74Â Â Â Â Â Â Â Â  In her 2012 initial order, the ALJ construed the then-applicable remedies section of CADA as permitting a front pay award.[3] The Board upheld this determination without any analysis.
 
 Â¶75Â Â Â Â Â Â Â Â  CSP contends former section 24-34-405 did not authorize the Board to award front pay. Alternatively, CSP contends the front pay awarded was excessive. Because we agree with the first contention, we set aside the front pay award, rendering the alternative contention moot.
 
 A. Preservation and Standard of Review
 
 Â¶76Â Â Â Â Â Â Â Â  To begin, Williams and the Board argue that we should not address CSPâs principal argument because it is unpreserved. CSP responds that an agencyâs statutory authority to order a remedy is a matter of subject matter jurisdiction, which cannot be waived.Â Also, CSP asserts that it preserved this argument by raising it before the AUJ on remand. We agree with CSP on both grounds.


 
 Â¶77Â Â Â Â Â Â Â Â  Administrative agenciesâ authority extends only so far as âdetermined and limited by the statutes by which they are created.â Colo. Div. of Empât & Training, Depât of Labor & Empât v. Indus. Commân, 665 P.2d 631, 633 (Colo. App. 1983). The statutes that define an agencyâs authority are jurisdictional.[4]Speer v. Kourlis, 935 P.2d 43, 48 (Colo. App. 1996). And âthe question of their applicability may be raised at any time.â Id.; see also F.W. Woolworth Co. v. D.C. Bd. of Appeals & Review, 579 A.2d 713, 716Â­17 (D.C. 1990); SBC Enters., Inc. v. City of S. Burlington Liquor Control Commân, 689 A.2d 427, 429 (Vt. 1996). Therefore, we conclude that CSPâs statutory front pay argument is a matter of subject matter jurisdiction, which cannot be waived.


 
 Â¶78Â Â Â Â Â Â Â Â  CSP also preserved this claim under its alternative analysis. Section 24-4-105(14)(c), C.R.S. 2015, states that â[f]ailure to file the exceptions . . . shall result in a waiver of the right to judicial review of the final order of such agency, unless that portion of such order subject to exception is different from the content of the initial decision.â (Emphasis added.) On remand to the AUJ to determine remedies, CSP argued that the Board lacked authority to award front pay. The amended order included the amount of front pay awarded, making it âdifferent from the content of the [AUJâs] initial decision.â Thus, CSP preserved this claim when it raised the statutory authority issue on appeal to the Board of the AUJâs remedies decision.
 
 Â¶79Â Â Â Â Â Â Â Â  This conclusion aligns with the principle that final judgments for purposes of appeal are those that âend[] the particular action in which it is entered, leaving nothing further for the court pronouncing it to do in order to completely determine the rights of the parties involved in the proceeding.â Harding Glass Co., Inc. v. Jones, 640 P.2d 1123, 1125 n.2 (Colo. 1982) (citation omitted); see also Â§ 13-4-102(1), C.R.S. 2015. â[A]n order or judgment establishing liability without determining damages is not final orÂ appealable.â Grand Cty. Custom Homebuilding, LLC v. Bell, 148 P.3d 398, 400 (Colo. App. 2006).


 
 Â¶80Â Â Â Â Â Â Â Â  The ALJâs initial order was not final because it did not determine damages, and CSP properly preserved its claim on appeal by raising it on remand to the ALJ. Thus, CSP preserved its claim by raising it before the ALJ on remand and then with the Board on appeal of the remedies decision.
 
 Â¶81Â Â Â Â Â Â Â Â  The same principles of review and deference apply here as are discussed in Part II.A. An action exceeding an agencyâs statutory power must be reversed. Â§ 24-4-106(7), C.R.S. 2015.
 
 B. Merits
 1. Law
 
 Â¶82Â Â Â Â Â Â Â Â  CADA authorizes remedies for employees aggrieved by workplace discrimination. The Board applies the remedies section of CADA. See generally Â§ 24-34-405, C.R.S. 2015 (listing remedial measures); Â§ 24-50-125.3 (describing Boardâs authority to hear appeals under CADA). When the ALJ issued her initial decision, section 24-34-405 provided:
 
 [T]he commission may order . . . affirmative action regarding: Back pay; hiring, reinstatement, or upgrading of employees, withÂ or without back pay; the referring of applicants for employment by any respondent labor organization; the admission to or continuation in enrollment in an apprenticeship program, on-the-job training program, or a vocational school; the posting of notices; and the making of reports as to the manner of compliance.


 
 Ch. 207, sec. 7, Â§ 24-34-405, 1989 Colo. Sess. Laws 1042.
 
 Â¶83Â Â Â Â Â Â Â Â  In 2013, the General Assembly amended CADA to provide additional remedies, including front pay awards. See Ch. 168, sec. 1, Â§ 24-34-405, 2013 Colo. Sess. Laws 549; see also Â§ 24-34-405(2)(a)(II) (â[T]he commission or the court may order affirmative relief . . . including . . . [f]ront pay[.]â). But because the amendment became effective in 2015, see 2013 Colo. Sess. Laws at 555, to resolve whether front pay was available to Williams, we must construe former section 24-34-405.
 
 Â¶84Â Â Â Â Â Â Â Â  We apply the same general principles of interpretation discussed in Part II above. Then, if this language is ambiguous, a court âmay look to pertinent legislative history to ascertain the General Assemblyâs intent.â Lang v. Colo. Mental Health Inst. in Pueblo, 44 P.3d 262, 264 (Colo. App. 2001).
 
 2. Application


 
 a. Statutory Language
 
 Â¶85Â Â Â Â Â Â Â Â  The former remedies section does not address front pay. Everyone would agree that when interpreting a statute, âwe must accept the General Assemblyâs choice of language and not add or imply words that simply are not there.â People v. Benavidez, 222 P.3d 391, 393-94 (Colo. App. 2009). Two more specific principles of statutory interpretation favor applying this general limitation here.
 
 Â¶86Â Â Â Â Â Â Â Â  First, because the statute lists several other remedies â all common to other statutes prohibiting employment discrimination â the lack of a reference to front pay does not âprevent[] . . . a reasonable application of the statute.â In re 2000-2001 Dist. Grand Jury, 97 P.3d 921, 924 (Colo. 2004). Rather, we may infer that the âinclusion of certain items implies the exclusion of others.â Cain v. People, 2014 CO 49, Â¶13 (citation omitted); see also Youren v. Tintic Sch. Dist., 343 F.3d 1296, 1308 (10th Cir. 2003) (â[T]he state legislature failed to mention punitive damages . . . in a law that authorized various specific forms of relief . . . . We are therefore unwilling to read punitive damages into a statute that does not expressly authorize them.â).


 Â¶87Â Â Â Â Â Â Â Â  Second, the former remedies section authorizes reinstatement, which is the reciprocal remedy to front pay. See Bergerson v. N.Y. State Office of Mental Health, 652 F.3d 277, 287 (2d Cir. 2011) (âAn award of front pay is an alternative to reinstatement where reinstatement is âinappropriate[.]ââ) (citation omitted). Given this relationship, we also infer that âhad the General Assembly wanted to [include front pay], it knew how to do so.â Shelter Mut. Ins. Co. v. Mid-Century Ins. Co., 246 P.3d 651, 662 (Colo. 2011); see also People v. Carrillo, 2013 COA 3, Â¶19 (âOne would expect that this issue would be within the scope of the latter section . . . .â).

 
 Â¶88Â Â Â Â Â Â Â Â  Thus, because the statutory structure evinces the General Assemblyâs intent to exclude front pay, we reject the Boardâs contrary interpretation. See, e.g., Rags Over the Ark. River, Inc. v. Colo. Parks & Wildlife Bd., 2015 COA 11M, Â¶37 (declining to follow an agencyâs interpretation because it was âinconsistent with the regulationâs plain language and is not entitled to deferenceâ).
 
 Â¶89Â Â Â Â Â Â Â Â  True enough, the former remedies provision does not say that the listed remedies are exclusive. And on this basis, the dissent contends that the former remedies provision is ambiguous. But even accepting the dissentâs position, examining the legislative history leads to the same result: the former remedies section did not permit front pay.
 
 b.Â Legislative History


 
 Â¶90Â Â Â Â Â Â Â Â  Under a predecessor to the former remedies section, a respondent employer could be required to take affirmative action, âincluding (but not limited to) hiring, reinstatement or up-grading of employees, with or without back pay . . . .â Ch. 176, sec. 6, Â§ 24-34-307(12), 1957 Colo. Sess. Laws 498 (emphasis added); see World Wide Constr. Servs., Inc. v. Chapman, 683 P.2d 1198, 1200 (Colo. 1984) (discussing the legislative history of section 24-34-307(12)). But when the General Assembly repealed and re-enacted the remedies provision in 1979, it removed âincluding (but not limited to).â Ch. 239, sec. 3, Â§ 24-34-405, 1979 Colo. Sess. Laws 932. The General Assemblyâs removal of language âserves as a statement of legislative intent that it did not wish to include such language.â Daniel v. City of Colorado Springs, 2014 CO 34, Â¶20. Thus, this amendment further supports limiting CADA remedies to those listed.
 
 Â¶91Â Â Â Â Â Â Â Â  Even so, the Board argues that the General Assembly expressly authorizing front pay in 2013 â more than two decadesÂ after the former section was last modified â shows that front pay has been available under CADA all along. See Â§ 24-34-405(2)(a)(II). This change, however, does not prove that the former version impliedly authorized front pay.


 
 Â¶92Â Â Â Â Â Â Â Â  While an amendment may either clarify or change an existing law, âwe presume that by amending the law the [General Assembly] has intended to change it.â City of Colorado Springs v. Powell, 156 P.3d 461, 465 (Colo. 2007).
 
 Â¶93Â Â Â Â Â Â Â Â  Colorado courts use a three-part analysis to determine whether this presumption has been overcome. See Mesa Cty. Land Conservancy, Inc. v. Allen, 2012 COA 95, Â¶10. First, the court considers whether the prior version of the statute was ambiguous; second, the court looks to the legislative history, including statements made by the billâs sponsors regarding its purpose; and third, the court considers the statuteâs plain language to determine if the General Assembly intended to clarify, not change, the statute. Id. at Â¶Â¶10, 16. But âeven a clear indication of intent to clarify cannot dispositively establish the meaning of previous legislation.â People v. Randell, 2012 COA 108, Â¶18 (quoting Union Pac. R.R. Co. v. Martin, 209 P.3d 185, 188 (Colo. 2009)).


 Â¶94Â Â Â Â Â Â Â Â  Applying the three-part analysis does not rebut the presumption that the General Assembly intended to change, rather than clarify, the remedies statute. See Mesa Cty., Â¶9. Even if the statute is ambiguous under the first factor, which we have conceded for purposes of addressing the dissent, the legislative history under the second factor, described more fully below, does not overcome the presumption that the General Assembly intended to change the statute, not to clarify it. As for the third factor, nowhere does the amended statute say that it merely clarifies the previous remedies statute. See Â§ 24-34-405(2)(a)(II).[5]

 
 Â¶95Â Â Â Â Â Â Â Â  The Board points to statements by legislators about front pay already being an available remedy in connection with the 2013 amendments, and Williams defers to the Boardâs brief regarding the construction of the remedies statute. But âthe views of one Congress as to the construction of a statute adopted many yearsÂ before by another Congress have âvery little, if any, significance.ââ United States v. Sw. Cable Co., 392 U.S. 157, 170 (1968) (quoting Rainwater v. United States, 356 U.S. 590, 593 (1958)); see also Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engârs, 531 U.S. 159, 170 (2001) (âThe relationship between the actions and inactions of the 95th Congress and the intent of the 92nd Congress in passing Â§ 404(a) is also considerably attenuated.â); Francen v. Colo. Depât of Revenue, 2012 COA 110, Â¶32 (âEach General Assembly is a distinct entity . . . , and therefore what a later General Assembly thinks a statute does or should mean says little, if anything, about what the General Assembly that enacted it intended it to mean.â), affâd, 2014 CO 54.


 
 Â¶96Â Â Â Â Â Â Â Â  Equally unavailing is the Boardâs emphasis on language of the bill summary accompanying the 2013 amendment. True enough, the summary states that the newly available remedies under CADA âwould be in addition to the remedies allowed under current law, namely, front pay, back pay, interest on back pay, reinstatement or hiring, and other equitable relief that may be awarded.â H.B. 13-1136, 69th Gen. Assemb., Reg. Sess. Â§ 1 (Colo. 2013) (emphasis added). But a bill summary âmay or may not have been relied on inÂ some measure by legislators in considering the bill[.]â Depât of Transp. v. Gypsum Ranch Co., LLC, 244 P.3d 127, 131 (Colo. 2010) (rejecting a similar legislative intent argument based on bill heading, with language not reflected in the enacted legislation). And the bill summary is not part of the final text of the statute. See id.


 
 Â¶97Â Â Â Â Â Â Â Â  Consequently, the legislative history does not establish that front pay was a remedy under CADA before the 2013 amendments went into effect.
 
 c. Colorado Cases Interpreting Former Section 24-34-405
 
 Â¶98Â Â Â Â Â Â Â Â  Likewise, statements about the predecessor remedies section in Colorado cases do not establish that it authorized front pay. At most, the cases are equivocal.
 
 Â¶99Â Â Â Â Â Â Â Â  On the one hand, a division of this court has described the economic remedies available under CADA narrowly: â[T]he only relevant remedies available for a statutory violation are reinstatement and back pay.â Bigby v. Big 3 Supply Co., 937 P.2d 794, 801 (Colo. App. 1996). Damages for pain, suffering, and emotional distress are unavailable. Id.


 
 Â¶100Â Â Â Â Â Â Â Â  On the other hand, a different division has upheld a front pay award for a limited time while the appointing authority searched for a vacant position in which to reinstate the employee. Ward v. Depât of Nat. Res., 216 P.3d 84, 97 (Colo. App. 2008). Without addressing Bigby, the division explained that âthe Board did not lack jurisdiction to order front pay until a vacant job was located.â Id. But for two reasons, Ward is unpersuasive.
 
 Â¶101Â Â Â Â Â Â Â Â  First, the division did not examine the language of section 24-34-405. Instead, it relied on Title VII; 42 U.S.C. Â§Â§ 2000e-17 (2012); Black v. Waterman, 83 P.3d 1130, 1133 (Colo. App. 2003); and the then-applicable Depât of Pers. & Admin. Board Rule 9-6, 4 Code Colo. Regs. Â§ 801-1 (2007).[6] But these authorities are not informative: the Title VII remedy provisions differ from those in CADA, as discussed below; Black, 83 P.3d at 1133, involved TitleÂ VII, not CADA; and the then-applicable version of Board Rule 9-6 â like the prior remedies section â did not mention front pay.[7]


 
 Â¶102Â Â Â Â Â Â Â Â  Second, the Ward front pay award was granted for only a limited period until the employee could be reinstated. Ward, 216 P.3d at 96. The division explained that â[p]lacing Ward on leave without payâ while the employer searched for an appropriate vacant position âwould not have redressed Wardâs injury.â Id. at 97. And reinstating Ward was impossible until a position could be found consistent with his disability. Id. Thus, the remedy in Ward represented a unique hybrid: both reinstatement and a provisionalÂ period of front pay. And the practical effect was to begin the employeeâs reinstatement â by paying him his regular salary â until the appointing authority could find a suitable position.


 
 Â¶103Â Â Â Â Â Â Â Â  True enough, the legislature did not amend the former remedies statute in the wake of Ward specifically to exclude front pay as a remedy. And the General Assembly amended other provisions of CADA between the decision in Ward in 2008 and the remedies amendments in 2013, while leaving the remedies section intact. But relying on legislative inaction to discern the General Assemblyâs intent âhas been called a âweak reed upon which to lean,â and a âpoor beacon to follow.ââ 2B Norman J. Singer & Shambie Singer, Sutherland Statutes and Statutory Construction Â§ 49:9 (7th ed. 2008); see also Francen, Â¶Â¶31-35.
 
 Â¶104Â Â Â Â Â Â Â Â  For these reasons, to the extent Ward could be read as upholding a front pay award under former section 24-34-405, we find its analysis unconvincing. This is especially so because the prior divisionâs analysis is limited. See People in the Interest of A.R., 2012 COA 195M, Â¶24 (declining to follow another division where the holding was âwithout an accompanying analysisâ); see also Lapponese v. Carts of Colo., Inc., 422 S.W.3d 396, 403 (Mo. Ct. App. 2013) (âWe are not persuaded by the limited analysis of the Missouri sales commission statutes by the Eighth Circuit, and decline to follow its interpretation of Section 407.913.â).
 
 d. Comparison to Other Civil Rights Statutes


 
 Â¶105Â Â Â Â Â Â Â Â  While Williams and the Board analogize CADA to Title VII, this comparison misses the mark. Courts have construed Title VII to permit front pay, although the statutory language does not expressly authorize it. See Black, 83 P.3d at 1133 (citing McCue v. Kansas, 165 F.3d 784 (10th Cir. 1999)); 42 U.S.C. Â§ 2000e-5(g)(1) (2012) (permitting affirmative action âas may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriateâ).
 
 Â¶106Â Â Â Â Â Â Â Â  Even so, â[w]hen conducting statutory interpretation, the Court âmust be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.ââ Gross v. FBL Fin. Servs., 557 U.S. 167, 174 (2009) (quoting Fed. Express Corp. v. Holowecki, 552 U.S. 389, 393 (2008)).
 
 Â¶107Â Â Â Â Â Â Â Â  And a closer look shows that the remedy provisions of CADA differ from those of Title VII. Title VII permits a broad range ofÂ remedies, including âsuch affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees . . . or any other equitable relief as the court deems appropriate.â 42 U.S.C. Â§ 2000e-5(g)(1) (emphasis added). The General Assembly did not grant Colorado courts this same power to fashion remedies under the former version of CADA. Instead, it listed specific remedies, including âBack pay; hiring, reinstatement, or upgrading of employees, with or without back pay.â 1989 Colo. Sess. Laws at 1042. And more importantly, as discussed above, the CADA analogue to Title VIIâs expansive language â âmay include, but is not limited toâ â was removed from the predecessor section in 1979. 1979 Colo. Sess. Laws at 932.


 
 Â¶108Â Â Â Â Â Â Â Â  To be sure, our supreme court has stated that remedies for violating civil rights statutes are âequitable in nature.â City of Colorado Springs v. Conners, 993 P.2d 1167, 1170 (Colo. 2000) (referring to remedies listed section 24-34-405). But the court added that such remedies âare aimed at eliminating workplace discrimination, not compensating individuals for their particular injuries arising from violations.â Id. at 1175 (emphasis added); see also Craig v. Masterpiece Cakeshop, Inc., 2015 COA 115, Â¶109Â (â[I]ndividual remedies are âmerely secondary and incidentalâ to CADAâs primary purpose of eradicating discriminatory practices.â) (citation omitted). And the supreme court has also said that CADA âpermits but does not require an award of back pay and does not authorize the [Colorado Civil Rights Commission] to award damages that might otherwise be available in a common law action.â Brooke v. Rest. Servs., Inc., 906 P.2d 66, 69 (Colo. 1995).[8]


 
 Â¶109Â Â Â Â Â Â Â Â  With only this much for guidance, we cannot conclude that our supreme court has resolved the front pay question before us.
 
 Â¶110Â Â Â Â Â Â Â Â  In the end, we conclude that former section 24-34-405 did not authorize front pay. Thus, because the Board exceeded its jurisdiction in awarding this remedy, this portion of the Boardâs order must be reversed.
 
 Â¶111Â Â Â Â Â Â Â Â  However, the Board may have affirmed the ALJâs conclusion that reinstatement was not feasible because it could make Williams whole by also affirming the front pay award. Because the Board might view reinstatement differently if front pay was not available, at oral argument the parties were asked for their positions on a limited remand to allow the Board to reconsider reinstatement. No party objected. Therefore, on remand the Board may consider ordering reinstatement. In its sole discretion, the Board may allow the parties to present further argument on this issue.


 
 V. Attorney Fees
 
 Â¶112Â Â Â Â Â Â Â Â  Finally, CSP contends the Boardâs attorney fees award to Williams is unsupported by substantial evidence, although it does not contest the amount of the award. We discern sufficient record support and therefore affirm the award.
 
 A. Preservation and Standard of Review
 
 Â¶113Â Â Â Â Â Â Â Â  To begin, Williams argues that CSP failed to preserve its attorney fees challenge because it did not raise this contention with the Board in its appeal of the initial order. Thus, as Williams argued concerning front pay, we should decline to reach the merits of CSPâs contention. Applying part of our rationale for concluding that the front pay issue was preserved, we also conclude that CSP preserved its contention on attorney fees.
 
 Â¶114Â Â Â Â Â Â Â Â  The AUJ awarded Williams attorney fees and costs in her initial decision but did not determine the amount. The BoardÂ affirmed the award and remanded for the ALJ to set an amount. Because an amount was not determined initially, the attorney fees decision was not final. Axtell v. Park Sch. Dist. R-3, 962 P.2d 319, 322 (Colo. App. 1998) (â[T]he order granting attorney fees does not determine the amount awarded. Thus, that portion of the judgment is not final until the amount of fees is set by the trial court.â).


 
 Â¶115Â Â Â Â Â Â Â Â  Thus, CSP was not required to challenge the attorney fees award when it appealed the ALJâs initial decision to the Board. And it did so when appealing the remedies decision.
 
 Â¶116Â Â Â Â Â Â Â Â  A reviewing court will affirm an administrative tribunalâs award of attorney fees if the award is warranted by evidentiary findings and has a reasonable basis in the law. Renteria v. Depât of Labor & Empât, 907 P.2d 619, 623 (Colo. App. 1994).
 
 B. Law
 
 Â¶117Â Â Â Â Â Â Â Â  Section 24-50-125.5(1), C.R.S. 2015, permits an award of attorney fees and costs to an aggrieved employee if the personnel action was âinstituted frivolously, in bad faith, maliciously, or as a means of harassment or was otherwise groundless[.]â âBad faithâ includes arbitrary, vexatious, abusive, or stubbornly litigious conduct. Mayberry v. Univ. of Colo. Health Sci. Ctr., 737 P.2d 427,Â 429-30 (Colo. App. 1987) (quoting W. United Realty v. Isaacs, 679 P.2d 1063, 1069 (Colo. 1984)). Bad faith also may encompass conduct that is disrespectful of truth and accuracy. Id.


 
 Â¶118Â Â Â Â Â Â Â Â  In Halverstadt v. Department of Corrections, 911 P.2d 654, 660 (Colo. App. 1995), the division explained that the employer did not act in bad faith because it relied on interpretations of applicable statutes and rules in making its determination. Id. And the employerâs determinations had a âreasonable basis,â precluding a finding of bad faith. Id. Similarly, in Sutton v. University of Southern Colorado, 870 P.2d 650, 652, 655 (Colo. App. 1994), the division concluded that an employerâs decision was not in bad faith because the employer asked for and received an opinion from the Attorney General that its actions were proper. Thus, this decision also had a reasonable basis. See id. at 655.
 
 Â¶119Â Â Â Â Â Â Â Â  In contrast, the employerâs actions in Ehrle v. Department of Administration, 844 P.2d 1267, 1272 (Colo. App. 1992), entitled the employee to attorney fees because the actions were in bad faith. There, the employer manipulated funding for an open position so that a recently laid-off employee â who was otherwise eligible for the position â would not be eligible to fill it. Id. at 1269. Further,Â the court determined that the employer had âconducted a sham interviewâ with the employee, with no intention of reinstating him. Id. at 1270. These facts led to the divisionâs conclusion the employer had acted in bad faith. Id.


 
 C. Application
 
 Â¶120Â Â Â Â Â Â Â Â  The AUJ concluded that CSPâs decisionmaking process lacked any reasonable basis and was made in bad faith. For the reasons discussed in Part III above, the record supports the findings underlying this conclusion. For example:
 
 
 CSP conducted an expedited investigation to determine whether it could deny Williamsâ reinstatement based on only the polygraph results, despite his having been otherwise very well qualified for reinstatement, but could not explain why it proceeded so swiftly.

 
 CSP did not seek the advice of agency counsel or rely on written policies, as in Halverstadt and Sutton.

 
 Instead, it relied on one district court case for support, despite Paxtonâs having told Keeton â and Keetonâs agreement â that denying reinstatement based on just the polygraph examination was not the best practice.Â 

 


 
 Â¶121Â Â Â Â Â Â Â Â  The AUJ also found that CSPâs actions were disrespectful of truth and accuracy, another badge of bad faith. The record supports this finding, too: Williams was over-qualified for the reinstatement position of trooper, he had a reputation for integrity, and CSP hired or rehired other applicants although they had failed their initial polygraph examinations.
 
 Â¶122Â Â Â Â Â Â Â Â  In challenging the attorney fees award, CSP reiterates that it did not reinstate Williams because he admitted to having viewed child pornography and engaged in sexual conduct in such a manner that âappearedâ to be prostitution, and the polygraph examination showed deception about undisclosed illegal sexual conduct. But when Colley told Williams that he would not be reinstated, Colley only discussed the failed polygraph exam. And the AUJ held the other proffered reasons to be only post-hoc justifications showing a pretext for intentional discrimination, which we have concluded has sufficient record support.
 
 Â¶123Â Â Â Â Â Â Â Â  Thus, we conclude that the record contains sufficient evidence showing CSP acted in bad faith and without any reasonable basis to affirm the attorney fees award.


 
 CROSS-APPEAL
 
 VI. Anti-Gay Culture
 
 Â¶124Â Â Â Â Â Â Â Â  In addition to concluding that CSP had intentionally discriminated against Williams, the ALJ found thatâs CSPâs âanti-gay cultureâ was âwell documented in this case.â But the Board rejected the anti-gay culture finding for two reasons: first, this finding was unnecessary to conclude that CSP had intentionally discriminated against Williams; and, second, the record did not support it.
 
 Â¶125Â Â Â Â Â Â Â Â  On cross-appeal, Williams asks us to reverse this aspect of the Boardâs order and reinstate the finding. For two reasons, we decline to do so.
 
 Â¶126Â Â Â Â Â Â Â Â  First, the Board is correct that the ALJâs evidentiary finding of an anti-gay culture within CSP was unnecessary to uphold her ultimate conclusion that CSP intentionally discriminated against him. This is so because Williams did not seek relief on the basis ofÂ a pattern and practice of discrimination,[9] nor was he required to show a pervasive culture of discrimination to succeed on his individual discrimination claim. Thus, insofar as this finding was unnecessary to the intentional discrimination conclusion that we have affirmed, we need not determine whether it is supported by the record. See, e.g., Bernstein Family Ltd. Pâship v. Sovereign Partners, 883 N.Y.S.2d 201, 202-03 (N.Y. App. Div. 2009) (explaining that an appellate court need not address arguments regarding unnecessary factual findings if other legal grounds on which the lower court relied were valid); In re T.M., 638 S.E.2d 236, 240 (N.C. Ct. App. 2006) (stating that when âample other findings of fact support an adjudication . . . , erroneous findings unnecessary to the determination do not constitute reversible error,â and declining to address claim).


 Â¶127Â Â Â Â Â Â Â Â  Second, even if the record did support the ALJâs finding of an anti-gay culture, any error of the Board in setting this finding aside would be harmless because we have agreed with the ALJ and the Board that CSP intentionally discriminated against Williams. See Sheep Mountain Alliance v. Bd. of Cty. Commârs, 271 P.3d 597, 606 (Colo. App. 2011) (errors in administrative proceedings will not require reversal unless the plaintiff can show prejudice).

 VII. Conclusion

 Â¶128Â Â Â Â Â Â Â Â  We reverse the front pay award and the arbitrary and capricious conclusion. We remand for the Board to refer the arbitrary or capricious claim to the Director and to reconsider reinstatement. In all other respects, we affirm the Boardâs decisions.


 [1] Section 24-50-103(6), C.R.S. 2015, reads:

 An action of the state personnel director or an appointing authority which is appealable to the board pursuant to this article or the state constitution may be reversed or modified on appeal to the board only if at least three members of the board find the action to have been arbitrary, capricious, or contrary to rule or law. Unless otherwise limited by this article or the state constitution, a decision of the board shall be subject to review pursuant to section 24-50-125.4.

 [2] 42 U.S.C. Â§Â§ 2000e to 2000e-17 (2012). CADA cases often look to Title VII where the relevant CADA language parallels Title VII. See, e.g., Colo. Civil Rights Commân v. Big O Tires, 940 P.2d 397, 399 (Colo. 1997).

 [3] Front pay is âmoney awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement.â Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 846 (2001).

 [4] Our supreme court has held that a district courtâs power to award particular relief is not jurisdictional. See, e.g., Paine, Webber, Jackson & Curtis, Inc. v. Adams, 718 P.2d 508, 513-14 (Colo. 1986). But this holding does not apply to agency proceedings because the constitution gives district courts general jurisdiction. Colo. Const. art. VI, Â§ 9(1) (âThe district courts shall be trial courts of record with general jurisdiction . . . .â).

 [5] The dissent suggests that excluding front pay creates a âperverse incentiveâ for employers to âmake working conditions so oppressiveâ such that reinstatement would be untenable, âwith the result that the unlawful discrimination cannot be remedied.â But the General Assemblyâs awareness of this consequence would equally support changing rather than clarifying the former remedies section to include front pay.

 [6] Past versions of Board Rules are available on the Colorado Secretary of Stateâs website, https://perma.cc/MVL7-5CKX.

 [7] Board Rule 9â6 read:

 If the Board finds that discrimination has occurred, it may order: cease and desist orders; hiring, reinstatement, or upgrading of employees, with or without back pay and compensation; referral of applicants for employment; admission or continuation of enrollment in on-the-job training; posting of notices and issuing orders as to the manner of compliance and corrective and/or disciplinary actions, as required; and, altering terms and conditions of employment as appropriate. This does not prohibit settlement by the parties at any stage of the proceedings.

 Depât of Pers. & Admin. Board Rule 9-6, 4 Code Colo. Regs. Â§ 801-1 (2007).

 [8] At least some courts have construed front pay as damages available in a common law action. See Peters v. Rivers Edge Mining, Inc., 680 S.E.2d 791, 811 (W. Va. 2009).

 [9] In the Title VII context, courts have explained that â[p]attern-or-practice cases differ significantly from the far more common cases involving one or more claims of individualized discrimination.â Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1106 (10th Cir. 2001). The pattern-or-practice theory premises liability on a pervasive culture or pattern of discrimination, whereas individual claims â like Williamsâ discrimination claim â focus on the reason for the employment decisions at issue. Id. (citing Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 876 (1984)).

 Â 

 
 JUDGE FOX concurs.
 
 JUDGE BERGER concurs in part and dissents in part.
 
 JUDGE BERGER, concurring in part and dissenting in part. I.


 
 Â¶129Â Â Â Â Â Â Â Â  By all accounts, Brett Williams was an exemplary Colorado State Patrol (Patrol) officer. He enjoyed a meteoric rise from trooper to captain in the short period of seven years. But in 2009 he decided to pursue another dream â to become a helicopter pilot â and resigned from the Patrol. At least one of his colleagues at the Patrol told him he was making a mistake and that colleague was right. Williams missed the camaraderie of the Patrol and participating in all of the things that the Patrol does for the state of Colorado.
 
 Â¶130Â Â Â Â Â Â Â Â  He applied for reinstatement but, despite his flawless record with the Patrol, he was denied reinstatement. A state hearing officer found that the reason for his nonreinstatement was because Williams was gay, a fact that he had taken pains to avoid disclosing, but which was improperly inquired into during the reinstatement process. The hearing officer found that Williams had suffered unlawful discrimination because of his sexual orientation and that the Patrol thus violated section 24-34-405 of the version of the Colorado Anti-Discrimination Act (CADA) in effect in 2010. Ch.Â 207, sec. 7, Â§ 24-34-405, 1999 Colo. Sess. Laws 1989 (pre-2015 CADA).[1]


 
 Â¶131Â Â Â Â Â Â Â Â  The hearing officer awarded back pay under CADA and attorney fees under the state personnel code. The hearing officer rejected the statutory remedy of reinstatement, specifically finding that because of the nature of the activities engaged in by a state patrol trooper, reinstatement was not available under these particular facts. As an alternative to reinstatement, the hearing officer awarded Williams almost $600,000 in front pay. The hearing officerâs decision was affirmed by the State Personnel Board (Board).[2]
 
 Â¶132Â Â Â Â Â Â Â Â  The majority correctly affirms the hearing officer and the Boardâs findings and conclusions that Williams suffered sexualÂ orientation discrimination in his application for reinstatement. But the majority guts the relief awarded by the hearing officer and affirmed by the Board by ruling that front pay is unavailable, under any circumstances, under pre-2015 CADA. In so doing, the majority fails to recognize that nothing in pre-2015 CADA prohibits, in appropriate cases, an alternative award of front pay when reinstatement is not feasible; does not accord enough importance to the specific facts of this case, in which the fact finder determined that reinstatement of Williams would subject him to personal safety issues; minimizes the best legislative history evidence of what remedies pre-2015 CADA authorizes; disregards a prior precedent of this court that held that front pay is available under pre-2015 CADA; and undervalues the multitude of federal court decisions which uniformly hold that front pay is available under federal anti-discrimination statutes that are similar (but not identical) to pre-2015 CADA.


 
 Â¶133Â Â Â Â Â Â Â Â  The majority does not dispute that if front pay is unavailable in this case, and if reinstatement is not ordered on remand, it is impossible to make Williams whole, and he will go uncompensated for the unlawful discrimination he suffered at the hands of theÂ Patrol. That result is neither compelled nor even permissible under established rules of statutory construction. Accordingly, I respectfully dissent from the majorityâs decision reversing the award of front pay.


 
 II.
 
 Â¶134Â Â Â Â Â Â Â Â  The majority first asserts that because front pay is not explicitly listed in pre-2015 CADA, it is not available. But the statute also does not state that front pay is not a remedy, or that the list of remedies provided is an exclusive list of the relief available. The plain language of the statute thus does not resolve the issue presented here.
 
 Â¶135Â Â Â Â Â Â Â Â  Significantly, however, pre-2015 CADA does explicitly provide for reinstatement. Front pay is a substitute for reinstatement and is an essential part of the âmake wholeâ relief mandated by the anti-discrimination laws. Pollard v. E.I. Du Pont de Nemours & Co., 532 U.S. 843, 850 (2001). Because front pay is awarded when reinstatement is not a viable option, id., I disagree with the majority that the express inclusion of reinstatement as a remedy necessarily means that the General Assembly intended to exclude front pay as an option.


 Â¶136Â Â Â Â Â Â Â Â  Sometimes reinstatement is not feasible. That is so, for example, if the employerâs persistent animosity towards the plaintiff has destroyed the plaintiffâs ability to be an effective employee. Spulak v. K Mart Corp., 894 F.2d 1150, 1157-58 (10th Cir. 1990). To deny front pay in these circumstances completely frustrates the legislative intent to make the injured person whole. See City of Colorado Springs v. Conners, 993 P.2d 1167, 1175 (Colo. 2000) (purpose of CADAâs remedies). Moreover, that denial creates the perverse incentive for an employer to make working conditions so oppressive to invoke a finding that reinstatement is unavailable, with the result that the unlawful discrimination cannot be remedied. Abuan v. Level 3 Commcâns, Inc., 353 F.3d 1158, 1176 (10th Cir. 2003). We must presume that the General Assembly did not intend such an illogical and absurd result, and we should not adopt a construction that produces one. See CLPF-Parkridge One, L.P. v. Harwell Inv., Inc., 105 P.3d 658, 661 (Colo. 2005).

 
 Â¶137Â Â Â Â Â Â Â Â  Second, the majority reasons that because the amendments to CADA that became effective in 2015 (2015 CADA amendments) explicitly authorize front pay as a remedy, it follows that front pay is unavailable under pre-2015 CADA, which did not expressly includeÂ front pay. It cites in support the principle that legislative amendments are presumed to change the law. City of Colorado Springs v. Powell, 156 P.3d 461, 465 (Colo. 2007). But that presumption may be rebutted by examining the statutory language and the statuteâs legislative history, Mesa Cty. Land Conservancy, Inc. v. Allen, 2012 COA 95, Â¶10, and there is ample evidence to rebut it here.


 
 Â¶138Â Â Â Â Â Â Â Â  Front pay is an equitable remedy. E.g., McCue v. Kansas, 165 F.3d 784, 792 (10th Cir. 1999). The remedies explicitly authorized by pre-2015 CADA indisputably are equitable in nature. The purpose of equitable remedies in discrimination cases is to make the claimant whole â to place the claimant in the position he would have been in but for the discriminatory conduct. Conners, 993 P.2d at 1175. Legal remedies, such as compensatory and punitive damages, were unavailable under pre-2015 CADA. 1989 Colo. Sess. Laws at 1042. Indeed, the Colorado Supreme Court and this court expressly interpreted pre-2015 CADA as authorizing only equitable relief, not creating a legal claim for damages. Contâl Title Co. v. Dist. Court, 645 P.2d 1310, 1316 (Colo. 1982); Bigby v. Big 3Â Supply Co., 937 P.2d 794, 801 (Colo. App. 1996); Agnello v. Adolph Coors Co., 695 P.2d 311, 313 (Colo. App. 1984).


 
 Â¶139Â Â Â Â Â Â Â Â  Thus, a legislative goal to add legal types of relief for certain violations, the express purpose of the 2015 CADA amendments, did not include expansion of equitable remedies which already were authorized by pre-2015 CADA. The bill summary for the 2015 CADA amendments supports this interpretation of pre-2015 CADA. The bill summary explained that current law did not permit an award of compensatory or punitive damages or attorney fees and costs in employment discrimination cases, and the purpose in amending the statute was to allow âthe additional remediesâ of these damages. H.B. 13-1136, 69th Gen. Assemb., Reg. Sess. Â§ 1 (Colo. 2013). The summary then went on to state: âThese damages would be in addition to the remedies allowed under current law, namely, front pay, back pay, interest on back pay, reinstatement or hiring, and other equitable relief that may be awarded.â Id. (emphasis added).
 
 Â¶140Â Â Â Â Â Â Â Â  Contrary to the majorityâs suggestion, divisions of this court repeatedly have considered bill summaries to determine legislative intent. See Meyerstein v. City of Aspen, 282 P.3d 456, 466 (Colo.Â App. 2011); Thermo Dev., Inc. v. Cent. Masonry Corp., 195 P.3d 1166, 1168 (Colo. App. 2008); Hane v. Tubman, 899 P.2d 332, 337 (Colo. App. 1995); People v. Kingsolver, 897 P.2d 878, 879 (Colo. App. 1995). So has a former justice of the supreme court. See Depât of Transp. v. Stapleton, 97 P.3d 938, 950 (Colo. 2004) (Kourlis, J., dissenting).


 
 Â¶141Â Â Â Â Â Â Â Â  The majority rejects the bill summaryâs clear statement of legislative intent, disregarding it as, essentially, unimportant. But the bill summary is significant not only for its language but also because it highlights the then-existing dichotomy between equitable and legal relief. The 2015 CADA amendments focused exclusively on amending the statute to add the availability of legal damages; they did not focus on any additional forms of equitable relief, such as front pay, because the assumption was that such equitable relief was already available under the existing version of the statute. Accordingly, the express inclusion of front pay as a remedy for CADA violations was a clarification to existing law, not a change to that law.
 
 Â¶142Â Â Â Â Â Â Â Â  Third, this court in Ward v. Department of Natural Resources, 216 P.3d 84, 96-97 (Colo. App. 2008), explicitly held that, at least inÂ some circumstances, front pay is authorized by pre-2015 CADA. The majority first attempts to distinguish Ward, focusing on the fact that front pay in that case was awarded only for a limited period. Id. at 96. But if CADA authorizes an award of front pay until an employee can be reinstated in part because, as the majority acknowledges, âreinstatement and front pay are alternate remedies,â then clearly it cannot also be true that, in the words of the majority, pre-2015 CADA âdid not authorize front pay.â


 
 Â¶143Â Â Â Â Â Â Â Â  In addition to attempting to distinguish Ward, the majority simply declines to follow it. I agree that this division is not bound to follow a prior divisionâs decision, but we should not easily cast aside a considered decision by a prior division of this court. In re Estate of Becker, 32 P.3d 557, 563 (Colo. App. 2000) (stating that âdivisions of this court generally have given considerable deference to the decisions of other [divisions]â), affâd sub nom. In re Estate of DeWitt, 54 P.3d 849 (Colo. 2002). Contrary to the majorityâs views,Â I believe that Ward was correctly decided, and we should follow it here.[3]


 
 Â¶144Â Â Â Â Â Â Â Â  The majority also gives short shrift to the multitude of federal cases that have, for years, interpreted similar (but not identical) federal anti-discrimination statutes to authorize awards of front pay even though those federal statutes, like pre-2015 CADA, did not explicitly authorize front pay awards.
 
 Â¶145Â Â Â Â Â Â Â Â  In rejecting the persuasive value of these federal precedents, the majority states that they are inapposite because the federal statutes contain other language that allows federal courts, but not the hearing officer or Board in this case, to award front pay. The majorityâs analysis is unconvincing.
 
 Â¶146Â Â Â Â Â Â Â Â  The Colorado Supreme Court has stated that â[t]he remedy for a violation of Title VII is substantially similar to the remedy prescribed in section 24-34-405.â Contâl Title Co., 645 P.2d at 1317 (emphasis added). The supreme court consequently has examined, and relied on, federal court precedent interpreting Title VII inÂ analyzing the pre-2015 CADA. See id. at 1318; Conners, 993 P.2d at 1175 (determining that the relief available under the pre-2015 CADA is noncompensatory and stating that the United States Supreme Court has held that âsimilar relief under civil rights statutes is non-compensatory in natureâ).


 
 Â¶147Â Â Â Â Â Â Â Â  Moreover, both the federal and state schemes share the same purpose â to make the claimant whole. See, e.g., Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 287 (1998) (Title VII); Conners, 993 P.2d at 1175 (CADA).
 
 Â¶148Â Â Â Â Â Â Â Â  Without a strong reason to depart from persuasive federal precedent, we should interpret pre-2015 CADA consistently with the federal courtsâ interpretation of Title VII: â[a]lthough front pay is not expressly listed as a remedy in Title VII, the power to grant equitable relief has been interpreted as including front pay.â Black v. Waterman, 83 P.3d 1130, 1133 (Colo. App. 2003) (citing McCue, 165 F.3d 784).
 
 Â¶149Â Â Â Â Â Â Â Â  Lastly, I do not accord the same significance as the majority to the 1979 amendment to CADA that removed the phrase âincluding (but not limited to)â from before the list of remedies. Rather, I findÂ persuasive Justice Quinnâs dissent in World Wide Construction Services, Inc. v. Chapman, 683 P.2d 1198, 1201-02 (Colo. 1984):
 
 Although the legislature in 1979 modified this all-inclusive language when it enacted [pre-2015 CADA], I view the modification as an effort to dispel the notion that the Commissionâs authority extended to an award of consequential damages, over and above back pay, that might otherwise be arguably implied from the âincluding but not limitedâ language of the prior statute.


 Â¶150Â Â Â Â Â Â Â Â  Such an interpretation is consistent with the general scheme of pre-2015 CADA to allow equitable relief but not legal damages.

 III.

 Â¶151Â Â Â Â Â Â Â Â  On this record, and under the law, Williams was entitled to an award of front pay. I would affirm the Boardâs affirmance of that remedy and respectfully dissent from the majorityâs reversal of the front pay remedy.[4]


 [1] As discussed in detail below, CADA was amended in 2013 to add legal remedies for certain violations; those amendments became effective on July 1, 2015. Â§ 24-34-405(3), C.R.S. 2015. For convenience, I refer to the version in effect at the time the Patrol denied Williamsâ reinstatement as pre-2015 CADA.

 [2] The Board vacated the hearing officerâs finding that there was a pervasive atmosphere of anti-gay sentiment in the Patrol, concluding that the evidence did not support that finding. The Board also vacated the hearing officerâs order that the Patrol take remedial action not specifically related to Williams.

 [3] Significantly, from 2008, when Ward was decided, until 2013 when the General Assembly amended CADA, the General Assembly did not legislatively overrule Ward and, indeed, the amendments conform to Wardâs holding.

 [4] I agree with the majorityâs analysis and disposition of the other issues in this case.




These opinions are not final. They may be modified, changed or withdrawn in accordance with Rules 40 and 49 of the Colorado Appellate Rules. Changes to or modifications of these opinions resulting from any action taken by the Court of Appeals or the Supreme Court are not incorporated here. 



Colorado Court of Appeals Opinions || December 31, 2015


Back